**Thaddeus Donald EDMONSON, Plaintiff–Appellant,**

v.

**LEESVILLE CONCRETE COMPANY, INC., Defendant–Appellee.**

No. 87–4804.

United States Court of Appeals, Fifth Circuit.

March 1, 1990.

James B. Doyle, Lake Charles, La., for plaintiff-appellant.

Joseph R. Ward, Jr., Anthony J. Clesi, Jr., New Orleans, La., pro se.

Steven C. Graalmann, John B. Honeycutt, Jr., Percy, Smith, Wilson, Foote, Walker & Honeycutt, Alexandria, La., John S. Baker, Jr., Atty., LSU Law Center, Baton Rouge, La., for amicus curiae Ward and Clesi.

John J. Weigel, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for amicus curiae Defense Research Institute, Inc.

Wood Brown, III, New Orleans, La., for amicus curiae LADC.

Before CLARK, Chief Judge, WISDOM, GEE, RUBIN, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH and DUHÉ, Circuit Judges.[1]

GEE, Circuit Judge:

Today we decide whether a private litigant in a federal civil case who challenges a venire member peremptorily can be made to give reasons for his action. Specifically,

---

**1.** Senior Judges Wisdom and Rubin were members of the original panel and sit on the en banc court for that reason, Judge Rubin having assumed senior status since the panel opinion was handed down.

we must determine whether he can be required to do so when his opposing party is a black person and the venireman stricken is black, so as to rebut the inference that he exercised the strike because of the would-be juror's ethnic group.

The Supreme Court has imposed such a requirement in criminal prosecutions of black defendants, *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and in partial reliance on that decision a panel of our court has extended the principle to this civil damage suit by reversing the trial court, which had held that such a rule does not obtain in civil litigation. *Edmonson v. Leesville Concrete Co., Inc.,* 860 F.2d 1308 (5th Cir.1988). We now reconsider that decision en banc and affirm the trial court.

We do so for two reasons: the mechanical one, that state action is not present in such a case as this; and the logical one, that striking a venireman in a civil case because you fear he may tend to favor your opponent over you neither demeans him nor calls in question the fairness of the civil justice system.

### Facts

The panel opinion states the relevant facts succinctly:

> Injured in an accident on a construction job at Fort Polk, Louisiana, a federal enclave, Thaddeus Donald Edmonson, a 34–year–old black male, sued Leesville Concrete Company for negligence in federal district court. The case was tried to a jury.
>
> Edmonson used all three of his peremptory challenges to excuse members of the venire who were white. Leesville challenged peremptorily two prospective jurors who were black and one who was white. Citing *Batson,* Edmonson asked the district court to require Leesville to articulate a neutral explanation for the manner in which it had exercised its challenges. The district court denied the request on the ground that the *Batson* ruling did not apply to civil proceedings, and then proceeded to impanel a jury composed of eleven white jurors and one

black juror. The jury rendered a verdict for Edmonson, assessing his total damages at $90,000, but, because it found him 80% contributorily negligent, awarded him only $18,000. Edmonson seeks a new trial because of Leesville's alleged racial discrimination in its exercise of peremptory challenges.

*Id.* at 1309–10 (footnote deleted).

### The Peremptory Challenge: 1066 A.D. through Swain

The history of the peremptory challenge in felony cases stretches back many hundreds of years to the roots of the common law. That history, both in England and in our Country, is reviewed with painstaking thoroughness by Justice White in his opinion for the Supreme Court in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). To his account we neither can nor need add anything; we merely repeat his relevant conclusions here for the reader's convenience:

(1) "The use of peremptory challenges is of ancient origin and is given in aid of the party's interest in having a fair and impartial jury." Wright & Miller, Federal Practice & Procedures: Civil § 2483, at 473 (citing to *Swain,* 380 U.S. 202, 217, 85 S.Ct. 824, 834, 13 L.Ed.2d 759 (1965).

(2) "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control.... It is often exercised upon the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another....' It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty." 380 U.S., at 220, 85 S.Ct. at 835.

(3) "The presumption [that the prosecutor is using the State's challenges to obtain a fair and impartial jury] is not overcome and the prosecutor there-

fore subjected to examination by allegations that in the case at hand, all Negroes were removed from the jury *or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it."* 380 U.S., at 222, 85 S.Ct. at 836 (emphasis added).

(4) Where, however, it is shown that peremptories are being used to serve the purpose of generally disqualifying blacks as jurors on a racial basis, relief can be had.

A vigorous dissent, written by Justice Goldberg and joined by Chief Justice Warren and Justice Douglas, would have extended the holding of *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880), to cover the situation presented by *Swain,* taking the view that a sufficient showing had been made that the strikes in question were exercised, not with reference to the outcome in the particular case, but for the purpose of denying to black citizens the same right to participate in the administration of justice as whites enjoyed.[2] 380 U.S., at 229, 85 S.Ct. at 840 *et seq.;* see also *United States v. Leslie,* 783 F.2d 541, 545–46 (5th Cir.1986) (en banc), vacated and remanded, 479 U.S. 1074, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987).

And so matters rested for twenty years. During these, the Equal Protection Clause was thought to bar any general or systematic disqualification of black citizens as veniremen on any notion of supposed incapacity or inferiority, but—as *Swain* explicitly noted—to permit them to be cut from a jury panel by peremptory challenge for any reason or for no reason, just as any other person might be struck. In essence, the peremptory could be exercised on any ground whatever, including race, that was directed and limited to seeking a given result in a particular case. Only when the challenge could be shown to have been employed as a device to eliminate blacks from jury service generally was it vulnerable to constitutional attack under *Swain.*

### Batson

A little over three years ago, in *Batson v. Kentucky, supra,* the Court acted for the first time seriously to trammel the use of the peremptory challenge to strike black veniremen in the criminal prosecution of a black.[3] James Batson, a black male, was indicted for burglary and receiving stolen goods. Because the prosecutor struck all four black persons on the venire, Batson was tried by an all-white jury and convicted. His Sixth and Fourteenth Amendment objections unavailing, he sought and got relief from the Supreme Court. The form which it took, however, was a reaffirmation of the root principle of *Swain*—that systematic exclusion of black jurors from trying black defendants in criminal cases infringes the rights of both—but a revision to lighten the evidentiary burden announced in *Swain.*

Justice Powell's opinion in *Batson* therefore observes that "[a] number of lower courts following the teaching of Swain reasoned that proof of repeated striking of blacks over a number of cases was necessary to establish a violation of the Equal Protection Clause."[4] 476 U.S., at 92, 106 S.Ct., at 172. (footnote deleted). Disapproving this very high standard of proof, which by hindsight it correctly characterized as "a crippling burden"[5], the Court laid out a less demanding, two-step process of proof: first, a prima facie showing by the defendant of discrimination against veniremen of his race; second, a coming for-

---

**2.** *Strauder* invalidated a state law limiting eligibility for jury service to white males.

**3.** The Court's citation to *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) implies, however, and the general wording and tone of *Batson* further indicate, that the ruling is not limited to black citizens.

**4.** With deference, this is scarcely surprising in view of the presence in *Swain* of such statements as "[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws." 380 U.S., at 221, 85 S.Ct., at 836.

**5.** For essentially the reasons set out by our Court in *United States v. Pearson,* 448 F.2d 1207, 1217 (5th Cir.1971).

ward by the state with a neutral explanation for each of its peremptory challenges to veniremen of that race. The Court is at pains, moreover, to make plain that an assumption of partiality on the mere basis of shared race will not do as such an explanation.[6] 476 U.S., at 97, 106 S.Ct., at 1723. Thus the law of strikes in criminal cases. Should it be extended to civil ones?

### State Action?

This issue is accurately stated by our panel as: "[W]hether the exercise of peremptory challenges by a private litigant in a civil action pending in federal court is a government action, to which the Fifth Amendment applies, or a private action, which the Constitution does not reach." 860 F.2d, at 1310. The answer to it is dispositive of the appeal; for if governmental action is not present, then the courts hold no warrant to interfere, in the name of equal protection, with the system of civil peremptory challenges.[7]

Our inquiry is assisted by the two-step test laid down by the Supreme Court in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982), for assaying the presence or absence of state action. The first requirement is clearly present here: that the claimed deprivation has resulted from the exercise of a right or privilege having its source in governmental authority. The second, however, seems equally clearly to be wanting: the presence of some figure who can fairly be characterized as a state actor.

In *Batson*, no such doubt arose: there the entire proceeding was commenced and carried through by the prosecuting attorney, the very embodiment of the state's power, acting in the direct interest of its most fundamental function, maintaining law and order. In today's case, no such figure is present; and only two conceivable candidates present themselves: the trial judge and the private defendant's trial attorney.

The notion of trial judge as "state actor" need not detain us long. In the first place, as the Supreme Court observed in *Swain*—factually and not in such a manner as to be subject to overruling by *Batson*—the peremptory challenge "is one exercised ... without being subject to the court's control...." 380 U.S., at 220, 85 S.Ct., at 835. The merely ministerial function exercised by the judge in simply permitting the venire members cut by counsel to depart is an action so minimal in nature that one of less significance can scarcely be imagined.[8] No exercise of judicial discre-

**6.** There are at least two reasons why a prosecutor might strike a black venireman called in the prosecution of a black defendant: the notion that black citizens are inherently unfit to serve as jurors, as per the statute invalidated in *Strauder*, or a belief that a black person may tend to favor members of his own ethnic group. The former is demeaning; the latter is not—although a belief in such a proposition is almost surely irrational, in view of the common knowledge that in our nation blacks both commit and suffer disproportionately from criminal violence. Thus, it seems plain, the law-abiding black citizen is scarcely likely to be indulgent toward *any* criminal, black or white—rather the contrary. See Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan.L.Rev. 545, 553–54 (1974–75).

At all events, the *Batson* Court appears to have concluded that since the latter, undemeaning reason for challenge cannot in practice be separated from the former, neither can be countenanced. Clearly, the reasoning supporting the Court's new posture on proof of race discrimination in jury strikes would apply equally to strikes based on religious affiliation, nationality, and the like. Equally clearly, such an extension would likely complicate the process of exercising peremptory challenges to such an extent that issues arising from it would at last wag those of guilt or innocence, thus effectively spelling the end of strikes in criminal cases. Indeed, Justice Marshall, in a separate concurrence, contends for just such a result. 476 U.S., at 107–08, 106 S.Ct., at 1728–29.

**7.** Indeed, as Part II of the panel opinion correctly notes, the Constitution says nothing of equal protection as regards acts of the federal government. The Supreme Court has, however, repaired this omission by implication. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**8.** To hold that this constitutes "action" would require our disregarding expressions of the Court such as that found in *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982), that a government "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement

tion is involved, rather a mere standing aside; so that the fault—if it is a fault—lies with the system which permits such challenges, not with the judge's mere ministerial compliance with what the rule requires.[9] Finally, it is hard to see how the Supreme Court could have reserved judgment, as it purported to do in *Batson*, on the strikes by defense counsel, if the "actor" was the judge. 476 U.S., at 89 n. 12, 106 S.Ct., at 1719 n. 12. If the judge is the actor, then, and if his mere excusing of veniremen who have been peremptorily challenged from further attendance at court be deemed an "act," it follows that every aspect of every civil trial, state and federal, is constitutionalized—a quantum procedural leap that we leave for the Supreme Court to make, should it wish to do so.

As for private counsel, it is inconceivable to us that a privately-retained lawyer, serving a private client in a damage suit such as this, should be viewed as a state actor.[10] Clearly he cannot be, at any rate, so long as the 1981 Supreme Court holding stands that even a public defender, paid by the state, in a criminal proceeding against an indigent defendant is not. *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Nor, common sense tells us, does private counsel partake of such a character. True, he is licensed by the State; not, however, for its benefit but in the hope of insuring a minimum degree of competence to his clients. Like the public defender, it is *their* interests, their partisan interests, which he serves; and where their proper and lawful interests and those of the State come into conflict, he hews to those of his client in every instance—and properly so. Nor is the interest of the state by any measure so deeply involved in civil litigation between private parties in its own courts as in criminal litigation there: in the former case it simply furnishes a level playing field for dispute resolution in the name of civic peace, in the latter it is the instigator and actor, with powerful interests of its own at stake. Nor can it be said that private counsel in a civil damage suit performs a "public function." [11]

And so, since it appears to us that no state actor is present on the scene of today's case, we conclude that Constitutional considerations are not implicated. So much for the mechanical application of precedent; we turn in closing to a few underlying considerations of logic and policy.

### Strikes in Practice

A function of strikes is to allow the parties to participate to some degree in the selection of the jury that is to try their case, to the end that each may not only have, but perceive that he has had, a fair and impartial trial. It is certainly main-

... that the choice must ... be deemed to be that of the State" and that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible ... under the ... Fourteenth Amendment." (citations omitted). See also *Evans v. Abney*, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970) (giving indirect effect to private person's discriminatory intent not state action for equal protection purposes.)

9. An example of such a system, which, as it involves the state itself requires the presence of no "state actor," is to be found in *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), invalidating state replevin laws as violating due process for want of a hearing before chattels could be repossessed. Such a legal system, if used at all in the manner specified by the state, would necessarily involve unconstitutional actions. The system of peremptory challenges, by contrast, specifies no unconstitutional actions but is at most—and like most

systems—subject to improper use by one disposed to do so. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722.

10. We have no occasion to consider the situation presented where the state appears as a civil litigant.

11. See *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). In *Terry*, the Supreme Court held the Jaybird party, a private political organization which excluded blacks from its nomination balloting, to be a state actor. Although the jury selection process, like the election process, involves both private and state action, the traditional roles of private counsel and the state have remained discrete in this case. The present situation is thus distinguishable from that in *Terry*, in which the nomination process of the Jaybird party was found to be "an integral part, indeed the only effective part, of the [entire] elective process." *Id.* at 469, 73 S.Ct. at 813.

tainable that this function is of greater significance in federal court proceedings than in most, for there the attorney's role in jury selection is perhaps at its nadir among American jurisdictions. Ordinarily, for example, counsel does not there address the venire; and his other functions are correspondingly reduced in this aspect of trial.

It is proverbial that strikes are exercised on diverse bases: to remove the venireman whom counsel thinks the court should have excused for cause or, occasionally, in the case where counsel is allowed to interrogate the venire, the venireman whom he perceives that he has seriously offended by his questions. But even more tenuously, strikes are exercised to excuse anyone who simply did not sit right with counsel ("I didn't like the way she looked at my client"), or whom he feels might for *any* reason have a predisposition toward the other side, or an aversion to his own. The literature on this subject, it being one familiar only to trial lawyers—a group not noted for its special devotion to scholarly writing—is sparse, but see Sutin, The Exercise of Challenges, 44 F.R.D. 286 (1967); Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan.L.Rev. 545 (1975). At any rate, every lawyer with substantial trial experience knows that he has often exercised strikes for which he could articulate no clear reason even to himself, but which he desperately wished to exercise. And at all events, a procedural device of such great age and broad acceptance as the civil peremptory challenge should require little defense: clearly, for a long time, and in jurisdiction after jurisdiction, it has been found to serve useful purposes. We should therefore avoid tampering with its essential feature, the absence of a requirement to give reasons for its use, unless either the reasoning or the authority of *Batson* requires that we do so. Because, despite their superficial similarity, the true contexts of the criminal prosecution and the civil trial are greatly different, we conclude that neither does.

To begin with, and as we note briefly above, the government is directly involved in the criminal prosecution, appearing in the person of one of its central figures, the prosecutor—without whose will it cannot be brought and upon whose performance as its central actor all depends. His role has no counterpart in civil litigation, for in this respect his will *is* the will of the State. But, more fundamentally, the entire purpose of a criminal prosecution is to enforce the purposes of the state, whereas the state has no purpose at all in civil litigation beyond preempting the use of private force to settle disputes—a purpose that is as well served, if the parties consent, by an arbitration to which the state is no party. Finally, in a criminal prosecution the jury serves in some real sense as, not only a safeguard against, but an instrument of, the state's power. Once invoked, its collective will is sovereign as to guilt or innocence and, sometimes, even as to life or death. For these reasons, we do not believe that a court proceeding so cautiously as did the Batson court, one which was careful to point out that its holding did not extend even to the exercising of peremptories by defense counsel in a criminal case, would have intended by that decision's authority to dictate our result today. 476 U.S., at 89 n. 12, 106 S.Ct., at 1719 n. 12.

Nor do we think that the Court's reasoning does so. As we have observed above, Justice Powell's opinion in *Batson* expressly states that its scope is limited to a reexamination of "that portion of Swain ... concerning the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race" from the jury. 476 U.S., at 82, 106 S.Ct., at 1714 (citation omitted).[12] In all other respects, *Batson* simply reaffirms *Swain*'s holding that "a State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection

12. The Court expressed no view on Batson's Sixth Amendment arguments. 476 U.S., at 84 n. 4, 106 S.Ct., at 1716 n. 4.

Clause." 476 U.S., at 84, 106 S.Ct., at 1716, quoting *Swain*, 380 U.S., at 203–04, 85 S.Ct., at 826–27. This is, however, a far cry from the proposition advanced by Mr. Edmonson in today's case, which can fairly be stated as

> Whenever a private litigant sued for damages by a black plaintiff strikes a black venireman, he can be required to give a reason other than their common ethnicity for having done so.

For several reasons, we do not believe that the considerations underlying *Swain* or the reasoning upon which it rests support such a proposition as this.

To begin with, the informing principle of the *Strauder–Swain–Batson* line of decisions is that black citizens cannot, as a matter of Constitutional law, be barred from full participation in the administration of criminal justice as jurors. *Strauder*, of course, involved an example of the most overt of such attempts to do so: an exclusion of blacks by statute from the entire venire summons process. As Judge Garwood, writing for our en banc court, has noted, such an exclusion is racially demeaning. *United States v. Leslie*, 783 F.2d 541, 554 (5th Cir.1986) (en banc), vacated and remanded, 479 U.S. 1074, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987). *Swain* and *Batson* were concerned with use by the state of peremptory challenges to accomplish the same purpose in a more roundabout way: to remove black veniremen from the case simply because they were black, the decisions differing from each other solely on the manner of proof, but agreeing in principle. And that principle, to reiterate it, is that neither directly nor indirectly can black citizens be denied the opportunity for criminal jury service on racial grounds alone. The reason underlying the principle is that the Constitution does not permit unequal treatment of citizens on the ground of race and will not entertain—because it is insulting—even the suggestion that one is unfit to discharge a civic duty for such a reason.

This is a far cry, however, from striking a black venireman for particular reasons in a particular case, even for reasons having to do with his race. To take a few examples, for obvious reasons counsel representing a defendant airline in a damage suit might well peremptorily challenge a black airline pilot who was himself on strike for higher wages against another airline. Such a challenge, based on an assumed situational animosity toward his client, clearly raises no equal protection problems, even though the venireman stricken is black. To take a closer case, however, one may well imagine that counsel defending a well-known member of the Ku Klux Klan in an action for, say, breach of contract by a white plaintiff might strike any black veniremen whom he had been unable to convince the judge to excuse for cause, not because of any notion of ethnic inferiority, but rather on the prudential ground of probable hostility, ineradicable despite the subject's best efforts. Such an action does not demean the stricken subject; it merely recognizes a probable fact of life. And finally, (arguably) today's case: counsel, representing a party opposing a black plaintiff, who strikes all blacks on the venire because he fears that they *may* be inclined—even if only ever so slightly—to favor one of their own. It seems to us very plain indeed that none of these strikes has been taken on a ground which is demeaning to its object.

As for the third example given, however, in *Batson* the Supreme Court clearly stated that such a reason must not be accepted for a strike in a criminal case:

> But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. Cf. *Norris v. Alabama*, 294 US, [587] at 598–599, 79 LEd 1074, 55 SCt 579 [583–584]; see *Thompson v. United States*, 469 US 1024, 1026, 83 LEd2d 369, 105 SCt 443 [445] (1984) (Brennan, Jr., dissenting from denial of certiorari). Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as

jurors, supra, [476 U.S.] at 86 [106 S.Ct. at 1717], 90 LEd2d, at 80, so it forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the juror's race. 476 U.S., at 97–98, 106 S.Ct., at 1723–24.

Thus, by Supreme Court mandate, in the criminal prosecution of a black defendant, it is as much a violation of equal protection for the prosecutor to strike a black venireman because he thinks he might be more inclined than another to favor such a defendant as it is to strike him because he views him as inherently unfit for service as a juror because of his race. More to the purpose, we think, than attempting to equate the two actions described is a recognition that to countenance such an explanation for such a strike would be to return to pre-*Strauder* days and permit the prosecutor in such a case, having thought up a new set of arguments for doing so, to strike a black venireman merely because he is black. The Court's result is, therefore, explicable on practical grounds in the context of criminal prosecutions. We think it would be much less so, however, in civil actions for damages between private parties—such as this one.

In a civil suit, unlike a criminal prosecution, the state itself takes no action on its own behalf that could be viewed as exhibiting official prejudice. It is, we think, a sound policy that requires the state to conform to stricter standards and appearances in dealing with its citizens than are demanded of those citizens in their dealings with each other. As an illustration, we need look no further than Justice Sutherland's often-quoted language in *Berger v. United States:*

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

295 U.S. 78, at 88, 55 S.Ct. 629, at 633, 79 L.Ed. 1314 (1935).

But more fundamentally, vastly different things are at stake in criminal trials and as regards the criminal jury than where civil trials and civil juries are concerned. The criminal jury is a central feature of the criminal justice system, where liberty and even life are at stake. It holds not only fact-finding powers but, because of the Double Jeopardy Clause, the de facto power to pardon. As to the criminal jury, then, we can see how the Court might strike the balance which it did in *Batson* between the actuality or even the appearance of racially motivated strikes and the "any reason or no reason" rule for peremptory challenges that has come down to us from the common law.

The civil jury, on the other hand, serves a fact-finding function only, and the issues before it are, generally speaking, limited to economic ones. To be sure, it is part of the civil justice system just as its criminal counterpart is part of the criminal one; but its function is far less pivotal and central even to civil litigation than that of a jury in a criminal case is to criminal justice. Private counsel, in striking such a jury, has in mind a simple imperative, far removed from that which should motivate the prosecutor.

For the prosecutor's aim is justice. He wins when justice is done and—although it is surely not the outcome he envisions—when it becomes apparent during the trial

of a criminal case, a la the celebrated fictional career of Perry Mason, that the accused is innocent of the crime with which he stands charged, the prosecutor has not "lost."

It is otherwise with the civil advocate. His client is in a quarrel, and he is in a fight. The fight may be a more or less genteel one, conducted in an ethical fashion to be sure; but it remains a fight nonetheless: one which, unless settled, will be won by one side of the contest and lost by the other. It is the first imperative of the civil advocate to see that it is his side that wins.

As with all other aspects of his case, counsel brings that proper concern to striking the jury; and, because of it, in doing so he follows one precept and one only: by all fair means, to get a jury which, given his foreknowledge of the case, he believes will in the end be more naturally disposed to favor his side of the dispute than that of his opponent. Within the limits of fair and ethical conduct, his sole concern is, quite properly, that his client gain the case. In such a context as this, we see no occasion to inquire into counsel's motives for his strikes or, at any rate, none that outweighs the value of leaving the common-law peremptory challenge system in undiminished effect. If counsel is astute, he will recognize the obvious truth that there are ordinarily more affinities between a black C.P.A. and a white C.P.A. than there are between a white C.P.A. and a white longshoreman. But even if he is obtuse, it remains that he is only a private person acting obtusely: one for whose actions the state is neither actually nor apparently accountable. That it stands aside, neither approving nor disapproving his actions, and permits him to exercise his three strikes for any reason, for no reason, or even for a bad reason does not implicate the state in his conduct.[13]

Finally, when the civic concerns which underlie the *Strauder* line of cases are removed or greatly lessened, as they are when we shift from service on the criminal jury to service on the civil one, it remains true that the traditional peremptory strike is a leveller of the playing field. It is exercisable against any venireman, high or low, black or white, rich or poor, and without specifying a reason. Thus the peremptory, as traditionally constituted, is a device tending more to equal treatment of all the venire than the strike as reconfigured in *Batson*, which requires counsel to possess (or invent) an articulable reason other than race for challenging a black venireman when a black defendant is being prosecuted, but none for challenging a white one. Thus while he can strike a white venireman for an honest but inarticulable reason—or for a silly one: some always strike barbers; others, housepainters—he must give a reason if he strikes a black one.[14] It is not for us to quarrel with the Supreme Court's *Batson* reconfiguration of the peremptory, but we decline to extend its strictures on this ancient right into the civil area, where the considerations on which *Batson* is based are, if present at all, far weaker than in the criminal field.

The judgment of the district court is therefore

AFFIRMED.

POLITZ, Circuit Judge, with whom PATRICK E. HIGGINBOTHAM, Circuit Judge, joins, specially concurring:

I concur in that portion of the majority opinion which concludes that there is no

13. We note that even if blacks are stricken for an improper reason, the fairness of the civil justice system to the individual litigants would not be compromised. The appellant does not allege, nor could he credibly do so, that he is unable to receive fair consideration from a jury which has only one black in its ranks. Indeed, if a fair cross-section of the community were essential to the proper functioning of the jury, "we would take steps to more nearly ensure that the composition of each individual jury roughly mirrored the community's group mixture." *United States v. Leslie,* 783 F.2d 541 (5th Cir.

1986), *vacated,* 479 U.S. 1074, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987). We see no need for such action at present and do not read *Batson* as requiring it. See *Batson,* 476 U.S., at 85 n. 6, 106 S.Ct., at 1716 n. 6 ("it would be impossible to apply a concept of proportional representation to the petit jury in view of the heterogeneous nature of our society").

14. Although it appears that an eccentric one will do. *See United States v. Romero–Reyna,* 889 F.2d 559 (5th Cir.1989) ("The P Rule").

state action involved in the exercise of peremptory challenges at issue in this civil action. I therefore join therein and in the affirmance of the trial court.

KING, Circuit Judge, concurs in the result.

ALVIN B. RUBIN, Circuit Judge, with whom WISDOM, JOHNSON and JERRE S. WILLIAMS, Circuit Judges, join, dissenting:

The issue before us is whether a party to a civil jury trial who has established a prima facie case that the opposing party is exercising his peremptory challenges to discriminate on the basis of race is entitled by the Constitution to require the challenger to express a reason for exercising the challenges other than racial bias and thus to explain why allowing the challenged jurors to be excused would not constitute a denial of equal protection of the laws. It is not, as the majority assumes, whether "striking *a* venireman in a civil case because you fear that *he* may tend to favor your opponent over you ... demeans him [or] calls in question the fairness of the civil justice system."[1] It is not whether a litigant's exercise of peremptory challenges can be questioned because his lawyer likes or doesn't like the face of a prospective juror, trusts or distrusts fat people or skinny people, favors or disfavors intellectuals, prefers or disdains outdoor types.[2] It is about assuring equal protection of the laws in the face of evidence that the peremptory challenge has been used to deny that constitutional right.

Peremptory challenges were authorized and may be exercised for nearly any reason at all, or for none, for irrational as well as rational reasons. Such challenges are a vital part of trial by jury.[3] They are not, however, guaranteed any role by the Constitution,[4] and are fully subject to its dictates. *Batson v. Kentucky*[5] holds that if, in a criminal case, a prima facie showing is made that the prosecutor is exercising peremptory challenges because of the race of the challenged juror, the defendant may require the court to call on the prosecutor for an explanation so that the court may determine whether the challenges reflect the prejudice that the Fourteenth Amendment was adopted to extirpate. Nothing in the words or purpose of the equal protection clause restricts its application to criminal prosecutions. Accordingly, I would extend *Batson* to civil cases, and I respectfully dissent from the majority's refusal to do so.

## I.

*Batson* does not permit a probe of the motive for every peremptory challenge. The defendant must first show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove members of his race from the venire. Second, the defendant may rely on the indisputable fact that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'"[6] The defendant must next show that these facts and any other relevant circumstances "raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."[7] In deciding whether the defendant has made the requisite show-

1. Majority at 219 (emphasis added).

2. Alschuler, The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, 56 U.Chi.L.Rev. 153, 200–01, 210–11 (1989).

3. *See Swain v. Alabama,* 380 U.S. 202, 212–20, 85 S.Ct. 824, 831–35, 13 L.Ed.2d 759 (1965).

4. *See Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28–30, 63 L.Ed. 1154 (1919); *see also Batson v. Kentucky,* 476 U.S. 79, 91, 106 S.Ct.

1712, 1720, 90 L.Ed.2d 69 (1986) (citing *Stilson* ); *Swain,* 380 U.S. at 219, 85 S.Ct. at 835, 13 L.Ed.2d 759 (1965) (same); *Holland v. Illinois,* — U.S. —, — – —, 110 S.Ct. 803, 806–10, 107 L.Ed.2d 905 (1990) (same).

5. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

6. 476 U.S. at 96, 106 S.Ct. at 1723 (quoting *Avery v. Georgia,* 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)).

7. 476 U.S. at 96, 106 S.Ct. at 1723.

ing, the trial court should consider all relevant circumstances. The Court expressed "confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." [8]

"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." [9] Although prosecutors may not rebut the defendant's case by merely claiming discrimination, alleging good faith, or stating the discriminatory judgment that black jurors would be more partial to the defendant because of his race, the explanation need not "rise to the level justifying exercise of a challenge for cause." [10] After receiving the State's explanation, the trial court "will have the duty to determine if the defendant has established purposeful discrimination." [11]

Every lawyer who has ever tried a case to a jury knows that peremptory challenges are in practice exercised for reasons that may range from suspicion that an individual venireperson may not favor one's cause to adherence to an idiosyncratic, irrational rule. [12] Federal courts are not inexperienced in evaluating action that is reprobated only if done for a specific reason but is permitted even if done for some other reason, however unfair, or for no reason at all. Thus we decide whether a state employee who has no property right in employment and is otherwise terminable at will has been discharged in retaliation for her exercise of First Amendment rights; [13] whether a private employee who is otherwise subject to discharge without cause has been fired in violation of the Age Discrimination in Employment Act; [14] and in general whether an unconstitutional or illegal purpose was a substantial factor in causing an otherwise valid action. [15]

The *Batson* test is demanding, requiring three specific steps of proof by the defendant before the challenger need utter a word and then permitting the challenger to explain if he wishes. The Supreme Court was careful to select a system of proof that steered between unfairly encouraging meritless claims and imposing a "crippling burden of proof," [16] one that courts had experienced and ably managed in a number of equal protection contexts. [17] The burden of proof of discrimination rests on the party who claims that he has been denied equal protection. Application of *Batson* to civil cases would not lead courts into a jury-selection morass, but would authorize a simple process readily administered by trial judges. [18]

## II.

The equal protection clause of the Fourteenth Amendment forbids "any State ... [to] deny to any person within its jurisdiction the equal protection of the laws." [19] Plainly that clause applies to action by the government, including, by extension under the Fifth Amendment, [20] the federal government, and does not forbid private acts, absent Congressional invocation of the au-

8. 476 U.S. at 97, 106 S.Ct. at 1723.

9. *Ibid.*

10. 476 U.S. at 97–98, 106 S.Ct. at 1723–24.

11. 476 U.S. at 98, 106 S.Ct. at 1724.

12. *See, e.g., United States v. Romero–Reyna,* 889 F.2d 559 (5th Cir.1989) (The "P" rule).

13. *See, e.g., Perry v. Sinderman,* 408 U.S. 593, 596–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972).

14. 29 U.S.C. § 621 *et seq; see, e.g., Trans World Airlines v. Thurston,* 469 U.S. 111, 124, 105 S.Ct. 613, 623, 83 L.Ed.2d 523 (1985).

15. *See, e.g., Washington v. Davis,* 426 U.S. 229, 239–45, 96 S.Ct. 2040, 2047–50, 48 L.Ed.2d 597 (1976).

16. 476 U.S. at 92, 106 S.Ct. at 1721 (citations omitted).

17. 476 U.S. at 93–98, 106 S.Ct. at 1721–24.

18. *Cf. Thomas v. Moore,* 866 F.2d 803, 805 (5th Cir.1989).

19. U.S. Const. art. XIV § 1.

20. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

thority granted by Section 5 of the Fourteenth Amendment.

## A.

Accordingly, the conduct allegedly causing the deprivation of a constitutional right must be "fairly attributable to the state."[21] To determine whether a deprivation is thus fairly attributable to the government, the Supreme Court in *Lugar v. Edmondson Oil Co., Inc.*, set forth a two-part test.

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state [sic] or by a person for whom the State is responsible.[22]

The majority concedes, as does the defendant-appellee, that this test was met. *Lugar* continues:

> Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.[23]

Explaining the Court's earlier decision in *Flagg Brothers, Inc. v. Brooks*,[24] the *Lugar* opinion illustrates the application of this second principle. Action by a private party pursuant to a statute *"without something more"* is not sufficient to justify a characterization of that party as a "state actor." But the "'something more' . . .

might vary with the circumstances of the case."[25] The Court referred to its own use in other cases of a number of different factors or tests in different contexts, referring to the "public function" test, the "state compulsion" test, the "nexus" test, and a "joint action" test.[26] The Court then reserved the question whether those tests are actually different in operation or are simply different ways of "characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation,"[27] clearly recognizing that in either event the inquiry into the "something more" required for state action must be based on the specific facts and entire context of a given case. Concluding its summary of the law of state action for the purposes of the equal protection clause, the Court cited with approval the teaching of *Burton v. Wilmington Parking Authority*[28] that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."[29]

*Lugar* itself is instructive, although the Court limited the extent of its holding[30] and considered the underlying commercial dispute as forming a private core to the conduct at issue.[31] A private creditor had alleged in an ex parte petition its belief that a debtor was disposing of or might dispose of his property in order to defeat his creditors. Acting on that petition, a clerk of the state court issued a writ of attachment that was then executed by the County Sheriff, effectively sequestering the debtor's property although it was left in his possession. The Court held that the creditor's joint participation with state officials was sufficient to characterize the creditor as a state actor for the purposes of

---

21. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482.

22. 457 U.S. at 937, 102 S.Ct. at 2753.

23. 457 U.S. at 937, 102 S.Ct. at 2754.

24. 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

25. 457 U.S. at 937, 102 S.Ct. at 2754.

26. 457 U.S. at 937, 102 S.Ct. at 2754–55.

27. *Ibid.*

28. 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

29. 457 U.S. at 939, 102 S.Ct. at 2755 (quoting *Burton*, 365 U.S. at 722, 81 S.Ct. at 860).

30. 457 U.S. at 939 n. 21, 102 S.Ct. at 2755 n. 21.

31. *See, e.g.*, 457 U.S. at 941–42, 102 S.Ct. at 2756.

the Fourteenth Amendment, the Court of Appeals having erred in "requir[ing] something more than invoking the aid of state officials to take advantage of state-created attachment procedures." [32]

In *Burton*, acknowledged by *Lugar* as addressing the second state-actor inquiry,[33] the Court considered the refusal of the operator-lessee of a restaurant located in a building owned by the state of Delaware to serve a black man. The restaurant's lease required that the space be used for the service of food and/or alcohol and constrained the lessee to abide by all applicable laws, but no state law or official commanded, authorized, or encouraged the lessee's discrimination. The Court found that the lessee was a state actor, as Delaware had "not only made itself a party to the refusal of service, but ha[d] elected to place its power, property and prestige behind the admitted discrimination," thereby denying any characterization of the conduct as purely private.[34] The likeness to the exercise of racially discriminatory peremptory challenges in the marbled halls of the nation's courts need not be stressed.

*Reitman v. Mulkey*[35] considered what would initially appear to be a more extreme form of state authorization: a California statute that protected the absolute discretion of state property owners to refuse to sell, lease, or rent such property to any persons he might choose. The Court abided by the California Supreme Court's appraisal that the statute was intended to "authorize" private racial discrimination in the housing market.[36] No such intent can be ascribed to the origin of the statutory right to peremptory challenges. Nevertheless, if not constrained by *Batson*, the

rules governing peremptory strikes vest absolute discretion in the parties. The state thereby guarantees the effect of an objection to seating an otherwise eligible juror by allowing no other to object in turn.

Notwithstanding the Supreme Court's warning in *Burton* that "to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted,' "[37] the majority considers today's decision to be bound by some controlling precept in the Court's previous decisions. If true, the controlling decisions are uncited. *Blum v. Yaretsky*[38] described itself as "obviously different from those cases in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the State so as to make it 'state' action for purposes of the Fourteenth Amendment."[39] Moreover, the action taken failed on the first *Lugar* element, here conceded, there being no suggestion that the nursing home's decisions "were influenced in any degree by the State's obligation to adjust benefits in conformity with changes in the cost of medically necessary care."[40] *Evans v. Abney*,[41] also cited by the majority, did not decide a state action question at all, but found that the state had exhibited no racially discriminatory motivation in nullifying a racially discriminatory trust and thereby removing from public use a park that under the trust could be enjoyed only by whites.[42]

### B.

Our "necessarily fact-bound inquiry"[43] cannot be accomplished by attempting to

---

**32.** *Ibid.*

**33.** 457 U.S. at 938 n. 19, 102 S.Ct. at 2754 n. 19.

**34.** 365 U.S. at 725, 81 S.Ct. at 862.

**35.** 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

**36.** 387 U.S. at 376, 381, 87 S.Ct. at 1631, 1634.

**37.** 365 U.S. at 722, 81 S.Ct. at 860 (quoting *Kotch v. Board of River Port Pilot Com'rs*, 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093 (1947)).

**38.** 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

**39.** 457 U.S. at 1003, 102 S.Ct. at 2785 (citing cases).

**40.** 457 U.S. at 1005, 102 S.Ct. at 2786.

**41.** 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970).

**42.** 396 U.S. at 445, 90 S.Ct. at 633–34.

**43.** *Lugar*, 457 U.S. at 939, 102 S.Ct. at 2755.

cast a single state actor of undisputed stature. The majority considers and rejects in turn the candidacies of the trial judge and the private defendant's trial attorney. It rejects "[t]he merely ministerial function exercised by the judge in simply permitting the venire members cut by counsel to depart [as] an action so minimal in nature that one of less significance can scarcely be imagined." [44] As for the defense counsel, the majority reasons that if *Polk County v. Dodson* [45] decided that a public defender was not a state actor, surely a private defender cannot be.

That a public defender does not, merely by virtue of his employment relationship with the state, act throughout the trial under color of state law, does not mean that the litigant or his lawyer may not, in a specific instance during trial, become a state actor. The rationale of *Polk County* was that "[e]xcept for the source of [the counsel's] payment," the relationship between the indigent defendant and the public defender was "identical to that existing between any other lawyer and client." [46] The public defender is entitled to professional independence and the same freedom of professional judgment as a privately retained lawyer. [47] It does not follow, as the majority assumes, that the public defender or a privately retained lawyer is never a state actor. Indeed, *Polk County* never considered the issue of state action; [48] to the extent that state action would have been lacking, as the *Lugar* Court suggested, it was because the "respondent failed to challenge any rule of conduct or decision for which the State was responsible," [49] a

near-verbatim recitation of *Lugar*'s first, here conceded, element. [50]

Examination of *Polk County* suggests instead the importance of considering the challenged conduct in depth, taking into account all its actors in the context in which they act, and avoiding conclusions driven by the characterization of particular players. The exercise of peremptory challenges is not an isolated event but part of an extensive statutory process applicable alike to civil and criminal cases triable by jury. "It is the policy of the United States," Congress has declared, "that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service. . . ." [51] To that end, "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status." [52]

Such provisions are not merely hortatory, but represent part of an active federal scheme to eliminate the discrimination that plagued the key-man system. In order to avoid discrimination in the selection of jury venires each district court must have a plan for random jury selection. [53] Congress has prescribed in some detail the contents of the plan, [54] the preparation of a master juror wheel and the completion of juror qualification forms, [55] the determination of the

44. Majority at 221.

45. 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

46. 454 U.S. at 318, 102 S.Ct. at 449.

47. 454 U.S. at 321–22, 102 S.Ct. at 451–52.

48. *See* 454 U.S. at 322 n. 12, 102 S.Ct. at 451–52 n. 12.

49. *Lugar,* 457 U.S. at 935 n. 18, 102 S.Ct. at 2752–53 n. 18.

50. 457 U.S. at 937, 102 S.Ct. at 2753.

51. 28 U.S.C. § 1861.

52. 28 U.S.C. § 1862.

53. 28 U.S.C. § 1863.

54. *Ibid.*

55. 28 U.S.C. § 1864.

qualifications for jury service,[56] and the method of selecting and summoning jury panels.[57] When the case is set for trial, potential jurors are summoned by a federal officer, the Clerk of the United States District Court, to report to the United States courthouse. They are paid a per diem fixed by statute for their service, whether selected for a jury or not, becoming at least in some sense public servants charged with important responsibilities.[58] At an appropriate time they are questioned in voir dire by a federal judge and, depending on local practice, by counsel, concerning their qualifications to sit as a juror.

The number of peremptory challenges is determined in the main by statute. In civil cases, each party is provided by statute with three peremptory challenges,[59] while in criminal cases the number varies with the charge: if the offense is capital, 20 per side; if punishable by imprisonment for more than one year, six for the government and 10 for the defendant; and if the offense is punishable less severely, three per side.[60] Nevertheless, the trial judge may affect every aspect of the exercise of peremptory challenges. Most plainly, the judge has broad discretion in determining the appropriate number and allocation of peremptory challenges in all multiparty cases,[61] and may even limit ten criminal codefendants to a total of ten peremptory challenges.[62]

Less directly, courts determine the impact of any given number of peremptory strikes. Local court rules control the number of jurors eventually impanelled in civil cases,[63] thereby governing the relative effectiveness of peremptory challenges in determining the composition of the jury. Individual judges control the conduct of voir dire and the information that may be discovered about the venire,[64] thus affecting the exercise of both peremptory challenges and challenges for cause. Of course, by virtue of the trial judge's broad discretion over the exercise of challenges for cause,[65] he may determine the number of jurors who remain eligible for the exercise of peremptory strikes,[66] the court's own strikes,[67] or for eventual impaneling; the Supreme Court has acknowledged that a state may go so far as to require that parties use their peremptory challenges to cure erroneous refusals by the trial court to excuse potential jurors for cause.[68]

The majority's view of the court's "purely ministerial role" in supervising peremptory challenges is perhaps most strikingly belied in the trial judge's broad discretion to determine the manner in which peremptory challenges are exercised: he may decide which side exercises the last chal-

**56.** 28 U.S.C. § 1865.

**57.** 28 U.S.C. § 1866.

**58.** Alschuler, *supra,* at 197.

**59.** 28 U.S.C. § 1870.

**60.** Fed.R.Crim.P. 24(b).

**61.** *See* 28 U.S.C. § 1870; Fed.R.Cr.P. 24(b).

**62.** *See Gradsky v. United States,* 342 F.2d 147, 152–53 (5th Cir.1965), *vacated on other grounds sub nom. Levine v. United States,* 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966); *see also Moore v. South African Marine Corp., Ltd.,* 469 F.2d 280, 281 (5th Cir.1972); *Carey v. Lykes Bros. Steamship Co.,* 455 F.2d 1192, 1194 (5th Cir.1972); *United States v. Williams,* 447 F.2d 894, 896–97 (5th Cir.1971); *Nehring v. Empresa Lineas Maritimas Argentinas,* 401 F.2d 767, 767–68 (5th Cir.1968), *cert. denied,* 396 U.S. 819, 90 S.Ct. 55, 24 L.Ed.2d 69 (1969).

**63.** *See Colgrove v. Battin,* 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973).

**64.** *See Rosales–Lopez v. United States,* 451 U.S. 182, 188–89, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981).

**65.** *See United States v. Jones,* 712 F.2d 115, 121 (5th Cir.1983).

**66.** *See United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976); *but see United States v. Garza,* 574 F.2d 298, 302–03 (5th Cir.1978); *Stewart v. Texas & Pacific Rwy. Co.,* 278 F.2d 676, 677–78 (5th Cir.1960).

**67.** *See United States v. Calhoun,* 542 F.2d 1094, 1103 (9th Cir.1976) (citing *United States v. Bailey,* 468 F.2d 652, 658, *aff'd on other grounds,* 480 F.2d 518 (5th Cir.1973) (en banc)), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977).

**68.** *See Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988).

lenge,[69] may require simultaneous exercise of challenges by the prosecution and defense,[70] and may even require that one party exercise her challenges first, thereby allowing the other party to then act with full knowledge of her opponent's choices.[71]

Peremptory challenges are not self-executing but are effected by the action of the judge who excuses the prospective juror. The court, and hence, "the State[,] is not merely an observer of the discrimination, but a significant participant.... The only thing the State does not do is make the decision to discriminate. Everything else is done or supplied by the State,"[72] a New York state judge has observed. By presiding over jury selection in his official, governmental capacity, a judge is intimately involved in the process that Tocqueville termed America's "greatest advantage" in "rub[bing] off th[e] private selfishness which is the rust of society."[73] By carrying out his duties in a way that permits peremptory challenges based on race, the rust of the judge's approval of discrimination rubs off onto society, corroding the national character by giving private prejudice the imprimatur of state approval. Thus the private litigant employing peremptory challenges on the basis of race has "acted together with or obtained significant aid from state officials"[74] in a manner sufficient to meet the second part of the *Lugar* test. "A state should not be permitted to delegate the power to determine the composition of official tribunals and then disclaim responsibility for the predictably discriminatory way in which this authority is exercised."[75] On its face, it is discriminatory state action for the government itself to establish and maintain a system of jury selection that authorizes blatant racial discrimination by litigants using the courts set up by, paid for, and operated by the government.

### III.

There are manifest differences between a criminal prosecution and a civil action and the degree of governmental involvement in each. In a criminal prosecution, the government, state or federal, initiates the proceeding against an unwilling defendant. The government prosecutes, and the full weight of the state's panoply of personnel and resources is brought to bear against the accused. In a civil matter to which the state is not a party, the plaintiff initiates the proceeding and private parties are matched against each other.

Neither the equal protection clause nor the rationale of the *Batson* case, however, is limited to the state's involvement in criminal prosecutions. The principle of equal protection applies to governmental action in civil as well as criminal matters,[76] federal as well as state.[77] While the Supreme Court in *Batson* considered only a defendant in a criminal case, its guiding precept was that a " 'State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.' "[78] Referring to its contemporary appraisal of the Fourteenth Amendment in *Strauder v. West Virginia*,[79] the Court endorsed the explanation that "the central concern of the recently ratified Fourteenth

---

**69.** *See United States v. Durham,* 587 F.2d 799, 801 (5th Cir.1979).

**70.** *See United States v. Sarris,* 632 F.2d 1341, 1343 (5th Cir. Unit A 1980).

**71.** *See Gafford v. Star Fish & Oyster Co.,* 475 F.2d 767, 767–68 (5th Cir.1973).

**72.** *People v. Gary M,* 138 Misc.2d 1081, 526 N.Y. S.2d 986, 994 (1988).

**73.** 1 A. Tocqueville, Democracy in America 295– 96 (Vintage Books ed. 1945).

**74.** *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2754.

**75.** Alschuler, *supra,* at 197.

**76.** *See, e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886).

**77.** *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**78.** *Batson,* 476 U.S. at 84, 106 S.Ct. at 1716 (quoting *Swain v. Alabama,* 380 U.S. 202, 203– 204, 85 S.Ct. 824, 826–27, 13 L.Ed.2d 759 (1965)); *see also* 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3 (citing cases).

**79.** 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880).

Amendment was to put an end to governmental discrimination on account of race." [80]

### A.

The fundaments upon which *Batson* rests discourage any suggestion that its development is rooted solely on the criminal context. *Strauder* determined that a black defendant had been denied the equal protection of West Virginia's laws when he was criminally convicted by a jury from which members of his race had been purposefully excluded. The exclusion of blacks from the jury was not the result of circumstances peculiar to his trial, his prosecutors, or the nature of his offense, but followed from a West Virginia statute limiting eligibility for service on all grand and petit juries to white males.[81] The Court observed that the words of the Fourteenth Amendment:

> contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race.[82]

It found the racial discrimination required by West Virginia to contradict "[t]he very idea of a jury," [83] obstructed the operation of an amendment designed "to strike down all possible legal discriminations" against blacks,[84] and held that such a law must yield to the federal statute permitting removal of civil suits and criminal prosecutions against persons denied their civil rights.[85]

The *Swain* Court surveyed the exercise of the Alabama struck-jury system in both the civil and criminal contexts, comparing it to the use of the peremptory challenge in the same aspects of other state systems.[86] After rejecting the argument that the Constitution "require[d] an examination of the prosecutor's reasons for the exercise of his challenges in any given case," [87] the Court considered Swain's broader claim that "there has never been a Negro on a petit jury in either a civil or criminal case in Talladega County" and that in criminal cases prosecutors had used their peremptory strikes to prevent blacks on the jury venire from sitting on the petit jury.[88] The Court concluded that although such a systematic practice would present a prima facie case under the Fourteenth Amendment,[89] Swain had failed to adequately allege the prosecutor's culpability in the complete absence of any blacks from the county's petit jurors, in part because he had failed to account for the participation of defense counsel in the result.[90]

*Swain*'s ambit was necessarily confined to the patterns and practices of prosecutors, and its standard of proof could not easily be extended to contemplate the constitutionally violative use of peremptory challenges by less frequent participants in the jury system, such as defense attorneys or counsel for civil plaintiffs. At the same time, it contemplated the inspection and discouragement of discriminatory practices in both civil and criminal employments of

**80.** 476 U.S. at 85, 106 S.Ct. at 1716; *see also Holland v. Illinois,* 110 S.Ct. 803, 810–11 ("the systematic exclusion of blacks from the jury system through peremptory challenges" is "obviously" unlawful).

**81.** 100 U.S. (10 Otto) at 305.

**82.** 100 U.S. (10 Otto) at 307–08.

**83.** 100 U.S. (10 Otto) at 308; *see also Holland v. Illinois,* 110 S.Ct. at 806–07 (citing *Strauder*); *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946).

**84.** 100 U.S. (10 Otto) at 310.

**85.** 100 U.S. (10 Otto) at 311–12.

**86.** 380 U.S. at 205–10, 217–18, 85 S.Ct. at 827–30, 834–35.

**87.** 380 U.S. at 222, 86 S.Ct. at 837.

**88.** 380 U.S. at 223, 85 S.Ct. at 837.

**89.** 380 U.S. at 224, 85 S.Ct. at 838.

**90.** 380 U.S. at 224–27, 86 S.Ct. at 838–39.

the jury venire.[91] *Batson*, by establishing a standard of proof that allows case-by-case inspection of the use of peremptory challenges, simultaneously commands full adoption of the promise of equal protection in every use of the venire. The universality of *Batson* was evident not only in its invocation of the equal protection clause, but also in its reliance, echoing *Swain*, on systems of proof founded primarily in the civil context.[92]

The judgment in *Batson* is but a continuation of the effort the Supreme Court began almost a century ago to eradicate the vice of racial discrimination in jury selection, extending the principles it had applied in *Strauder* and in *Swain*. As *Batson* spoke of *Strauder*, "[t]hat decision laid the foundation for the Court's unceasing efforts to eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn."[93] While the history of peremptory challenges may have begun before the Battle of Hastings, the federal governmental interest in eradicating racial discrimination began only after Appomatox, and the salutary effect of the equal protection clause did not end with *Batson* in 1986. As *Holland v. Illinois*[94] most recently emphasized, the Fourteenth Amendment contains an "intransigent prohibition of racial discrimination" applicable to all aspects of the jury system.[95] We must not now retreat.

## B.

The only other circuits confronting the question of *Batson*'s application to civil cases have held that it applies with equal force in that context.[96] The Eleventh Circuit, in *Fludd v. Dykes*,[97] held that "the policies underlying the Supreme Court's decision in *Batson* are equally applicable in the civil context," explaining that the wrong done to an individual litigant's constitutional rights and the minimal burden imposed by *Batson* were no different in the civil setting.[98] Reaching the same result the Eighth Circuit in *Reynolds v. City of Little Rock*,[99] noted that "the Equal Protection Clause of the Fourteenth Amendment does not contain any latent distinction between criminal and civil legal process,"[100] and that "[t]he more natural reading of *Batson* is that its rule of non-discrimination applies ... without distinguishing criminal and civil legal proceedings."[101]

The concerns undergirding the *Batson* holding that "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure"[102] apply to civil no less than criminal proceedings. The *Batson* opinion itself provides the explanation: "Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try,"[103] and, we add, the private litigant whose dispute they are called to adjudicate, but also insults the challenged venireperson. "Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at

**91.** See *King v. County of Nassau*, 581 F.Supp. 493, 499–500 (E.D.N.Y.1984); *see also Clark v. City of Bridgeport*, 645 F.Supp. 890, 895 (D.Conn.1986) (citing *Swain* and *King*).

**92.** Cf. *Reynolds v. City of Little Rock*, 893 F.2d 1004 (8th Cir.1990).

**93.** 476 U.S. at 85, 106 S.Ct. at 1716.

**94.** —— U.S. ——, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

**95.** *Ibid.*

**96.** The Fourth, Sixth, and Seventh Circuits have declined to resolve the issue. *See Nowlin v. General Tel. Co. of the Southeast, S.C., Lake City Dist.*, 892 F.2d 1041 (4th Cir.1989) (unpublished opinion); *Robinson v. Quick*, 875 F.2d 867 (6th Cir.1989) (unpublished opinion); *Boykin v. Hamilton County Bd. of Educ.*, 869 F.2d 1488 (6th Cir.1989) (unpublished opinion); *Maloney v. Plunkett*, 854 F.2d 152, 155 (7th Cir.1988).

**97.** 863 F.2d 822 (11th Cir.1989).

**98.** *Id.* at 828–29.

**99.** 893 F.2d 1004.

**100.** *Ibid.*

**101.** *Ibid.*

**102.** 476 U.S. at 85, 106 S.Ct. at 1716.

**103.** 476 U.S. at 87, 106 S.Ct. at 1718.

a trial. A person's race simply 'is unrelated to his fitness as a juror'.... The harm from discriminatory jury selection, indeed, extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." [104]

Peremptory challenges occupy as important a position in the trial of civil cases as they do in criminal cases, and denying the application of *Batson* in the civil setting would erect an unconstitutionally adventitious division on the operations of jury trial procedure. The same member of the community called for jury service who would enjoy protection against racial discrimination if she were assigned to a criminal venire would be subject to the exercise of a blatantly discriminatory strike if she is first asked to fulfill her duty as a civil venireperson.[105] The same Assistant United States Attorney or State District Attorney forbidden by *Batson* from infringing on the rights of a criminal defendant or a venire member called to try him would infringe on the apparently contentless rights of civil defendant and a civil venire member.[106]

Racial prejudice has no more place in the federal courtroom on the days the court is conducting a civil trial than it does on the days when the same judge, seated at the same bench, in the same courtroom, before the same American flag, is conducting a criminal trial.[107] As the Supreme Court remarked in a related context,

It is irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen, offensive because of his race ...[108]

For the majority, however, there remains something ineffably different about civil proceedings, a difference apparently material to the racially discriminatory exercise of peremptory strikes; "fundamentally, the entire purpose of a criminal prosecution is to enforce the purposes of the state, whereas the state has no purpose at all in civil litigation beyond preempting the use of private force to settle disputes—a purpose that is as well served, if the parties consent, by an arbitration to which the state is no party." [109] Leaving aside for the moment those civil cases to which the government is a party,[110] and differentiating the issue of state action, the majority's assessment ignores the myriad ways in which the state and society evince a genuinely *civil*, civic, and non-privatistic interest in civil litigation. The Seventh Amendment preserves the right of trial by jury in suits at common law in which the value in controversy exceeds twenty dollars, thus interposing the civil jury as an important constraint on the power of government.[111] Such civil jury cases are administered by the government and conscript citizens to serve as jurors; last year federal district courts tried more civil jury cases than criminal jury cases.[112] Nor does the nominal

---

**104.** *Ibid.* (citations and portions of text omitted); *see also* 28 U.S.C. § 1862.

**105.** *Cf.* 28 U.S.C. § 1866(c), (e), (f).

**106.** *See* 28 U.S.C. § 547.

**107.** *See Maloney v. Washington,* 690 F.Supp. 687 (N.D.Ill.1988) (memorandum opinion), *vacated on other grounds, Maloney v. Plunkett,* 854 F.2d 152 (7th Cir.1988).

**108.** *Burton v. Wilmington Parking Authority,* 365 U.S. at 724, 81 S.Ct. at 861.

**109.** Majority at 231–32.

**110.** *See infra* notes 118–20 and accompanying text.

**111.** *See* Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn.L.Rev. 639, 644, 708–10 (1973); Note, The Civil Implications of *Batson v. Kentucky* and *State v. Gilmore:* A Further Look at Limitations on the Peremptory Challenge, 40 Rutgers L.Rev. 891, 946–48 (1988).

**112.** Report of the Proceedings of the Judicial Conference of the United States, Annual Report

identification of the parties do justice to the nature of the dispute: The United States, for example, not infrequently participates in civil suits as an *amicus curiae*,[113] and private persons are authorized by Congress to act on behalf of themselves and the United States as "private attorneys general" and *qui tam* plaintiffs.[114] Congress has also authorized private claimants to seek redress for injuries otherwise compensable in common law to promote the public interests embodied in statutes such as the Clayton Antitrust Act[115] and Title VII of the Civil Rights Act of 1964.[116] In federal courts, at least, the only major category of cases in which federal governmental interest is minor is diversity, and in those the Constitution itself requires that the federal judiciary provide a forum that is not only neutral but equally protective of individual rights.[117]

## C.

Although the majority finds "no occasion to consider the situation presented where the state appears as a civil litigant,"[118] such an occasion will necessarily disturb its intended limitation of *Batson* to the criminal context. When government is a litigant, it becomes clear that "[t]he distinction that is crucial for application of equal-protection principles is that between governmental actors and private actors."[119] Pursuing the criminal-civil distinction under such circumstances would seemingly license the state's discriminatory exercise of peremptory challenges in a manner "[ ]related to the outcome of the particular [civil] case on trial"[120] if it chose to seek civil sanctions rather than criminal against a particular defendant. The Fourteenth

Amendment (and, for that matter, the Eighth) does not admit of such a subtle understanding of civil rights. Once such a case is considered, the criminal-civil distinction collapses, leaving only the examination of state involvement in those cases to which the government is not a party, such as the present one. The "slippery slope" that concerns the majority,[121] whether the product of *Batson*'s extension to other protected groups or its extension to civil jury trials, must simply be considered a necessary product of the scope of the equal protection clause, and cannot be used to suggest a limit to its dictates or a retreat from the logic of *Batson*.

## IV.

The use of peremptory challenges solely on the basis of racial animus, that is, as a device to bar a citizen from trial by a jury of all of his peers, save those of a certain race, cannot be justified by its history, ancient or modern, or by its utility to lawyers in attempting to win lawsuits. Racial prejudice was sanctioned by both the original Constitution and the Bill of Rights. The enactment of the equal protection clause marked the beginning of a new era, an era in which it was to be hoped that the color of a person's skin would not affect his legal rights.

The requirement of state action is in large part intended to "require the courts to respect the limits of their own power as directed against state governments and private interests."[122] "The petit jury," in turn, "has occupied a central position in our system of justice by safeguarding a person accused of crime against the arbitrary exercise of power by prosecutor or judge."[123]

of the Director of the Administrative Office of the United States Courts table C7 at 225 (1988).

113. *See, e.g.,* Sup.Ct.R. 36.

114. *See* Caminker, The Constitutionality of *Qui Tam* Actions, 99 Yale L.J. 341, 342–44 (1989).

115. 15 U.S.C. §§ 15, 26.

116. 42 U.S.C. § 2000e–5. *See generally* Stewart & Sunstein, Public Programs and Private Rights, 95 Harv.L.Rev. 1195 (1982).

117. U.S. Const. art. III, § 2, cl. 1.

118. Majority at 222 n. 10.

119. *Reynolds v. City of Little Rock; see also Fludd,* 863 F.2d at 828–29; *Clark,* 645 F.Supp. at 894–96.

120. *Swain,* 380 U.S. at 224, 85 S.Ct. at 838.

121. Majority at 221 n. 6.

122. *Lugar,* 457 U.S. at 936–37, 102 S.Ct. at 2753.

123. *Batson,* 476 U.S. at 86, 106 S.Ct. at 1717 (citations omitted).

Edmonson's invocation of his constitutional rights compels us to acknowledge the scope of judicial culpability in administering the racially discriminatory exercise of peremptory strikes against what remains, at least if unblemished, a cherished bulwark against every misuse of authority. We must take another step toward the goal of eradicating racial prejudice by eliminating the shameful practice of permitting a federal statute to be employed in a trial in a federal courtroom as a weapon of discrimination. I regret that the majority cannot yet see that to permit a person to be rejected from a jury solely because of the color of his skin rejects the promise upon which this nation's independence was based and the guarantee that the Fourteenth Amendment provides: that all persons are created equal. In God's sight. In human right. And in regard to service on a federal jury.