Martha DUNHAM and Preston Dunham, Plaintiffs–Appellants,

v.

FRANK'S NURSERY & CRAFTS, INC., Defendant–Appellee.

No. 89–2109.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1990.

Decided Dec. 12, 1990.

Saul I. Ruman, Thomas A. Clements, Ruman, Clements & Tobin, Hammond, Ind., for plaintiffs-appellants.

Frank J. Galvin, Robert H. Bahner, Galvin, Stalmack, Kirschner & Clark, Hammond, Ind., for defendant-appellee.

Before POSNER, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

■ The issue in this case is whether the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) forbids a private litigant in a civil case from exercising a peremptory challenge on racial grounds. Other circuits confronting this issue have reached opposite conclusions. In *Fludd v. J.B. Dykes*, 863 F.2d 822 (11th Cir.1989), the Eleventh Circuit held that *Batson* applies to the exercise of peremptory challenges by a private litigant in a civil case. In a recent *en banc* opinion, the Fifth Circuit held that *Batson* is limited to criminal cases. *Edmonson v. Leesville Concrete Co., Inc.*, 895 F.2d 218 (5th Cir.1990) (en banc).[1] We declined to resolve this issue in *Maloney v. Plunkett*, 854 F.2d 152, 155 (7th Cir.1988) on the grounds that it was not ripe for decision in that appeal. Today, we join the Eleventh Circuit in holding that *Batson* forbids a private litigant in a civil case from exercising a peremptory challenge on racial grounds.[2]

Martha Dunham was injured in December of 1985 while shopping at Frank's Nursery & Crafts in Merrillville, Indiana. Mrs. Dunham received an electrical shock when she placed a Christmas ornament plug into a portable electric outlet. Frank's directed its customers to use the portable outlet to test the working condition of electrical ornaments prior to purchase. Martha Dunham brought a negligence suit against Frank's to recover for her injuries; her husband, Preston Dunham, asserted a claim for lost consortium and services of his wife due to her injuries. Jurisdiction in federal court was based upon diversity of citizenship in accordance with 28 U.S.C. § 1332.[3]

Frank's and the Dunhams both consented to a United States Magistrate conducting all proceedings. On April 24, 1989, a jury trial was commenced. Both Mr. and Mrs. Dunham are black, and of the jury panel examined during voir dire, the only black member to be seated on the petit jury was peremptorily struck by Frank's. The Dunhams objected to this peremptory strike, claiming that it was racially motivated. The magistrate declined to require Frank's to provide a non-racial explanation for its strike, correctly noting that neither the Supreme Court nor the Seventh Circuit has held that *Batson* applies to a civil case. The case proceeded to trial with a jury of seven white members. On April 28, 1989, the jury rendered a verdict against the Dunhams finding that, under Indiana's Comparative Fault Act, Martha Dunham's fault was greater than fifty percent. The Dunhams appeal solely on the ground that the magistrate erred in declining to order Frank's to provide a non-racial explanation for its peremptory strike as required by *Batson*.

In *Batson*, the Supreme Court held that the equal protection clause of the fourteenth amendment forbids a prosecutor in a state criminal trial from using peremptory challenges to strike potential jurors from the venire solely because they are of the same race as the defendant. 476 U.S. at 89, 106 S.Ct. at 1719.[4] In addition, the

1. The *en banc* opinion vacated the original panel opinion, which held that *Batson* applies to a private litigant in a civil case. *See Edmonson v. Leesville Concrete Co., Inc.* 860 F.2d 1308 (5th Cir.1988).

2. In *Reynolds v. City of Little Rock*, 893 F.2d 1004 (8th Cir.1990), the Eighth Circuit held that the requirements of *Batson* apply to a civil case when the government is the civil litigant exercising the peremptory challenge. *Id.* at 1008. The court declined to express a view on whether the action of a trial court alone, in a case involving

no government litigants, can supply the necessary element of state action. *Id.* n. 2.

3. Martha and Preston Dunham are residents of Lake County Indiana; Frank's Nursery & Crafts, Inc. is incorporated in the state of Michigan and has its principal place of business in Michigan. The amount in controversy exceeds $50,000.

4. *Batson* was based on the equal protection clause of the fourteenth amendment, which applies only to the states, not the federal government. However, the right to equal protection of

Court formulated an evidentiary standard for establishing that the state has struck a potential juror on account of his race. Specifically, the Court held that the prosecutor's striking of a defendant's racial peer from the venire can be used as circumstantial evidence of the prosecutor's discriminatory intent. In so doing, the Court overruled the portion of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) which held that a prosecutor's use of a peremptory challenge is presumptively based on proper considerations related to the case he is trying. Departing from *Swain,* the Court concluded that a defendant may establish a prima facie case of racial discrimination solely on evidence concerning the prosecutor's use of a peremptory challenge at the defendant's trial. *Batson,* 476 U.S. at 95–96, 106 S.Ct. at 1722–23.

In order to establish a prima facia case under *Batson,* the defendant must first show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to prevent members of his race from serving on the jury. Second, the defendant is entitled to rely on the fact that the mere exercise of a peremptory challenge can be used as circumstantial evidence of discriminatory intent. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used peremptories to exclude veniremen from the petit jury on account of their race. *Id.*

Once the defendant makes a prima facia showing, the burden shifts to the state to come forward with a non-racial explanation for its challenge. Although the prosecutor's explanation does not have to rise to the level of cause, the mere denial of a discriminatory motive, or an affirmation of

prosecutorial good faith does not suffice as a neutral explanation. After hearing the state's explanation, the trial court must determine if the defendant has established purposeful discrimination. *Id.* at 97–98, 106 S.Ct. at 1723–24.

It is important to emphasize that the holding of *Batson* was based on the equal protection clause of the fourteenth amendment, not the sixth amendment right to a jury trial in criminal cases.[5] While sixth amendment rights apply only to criminal defendants, equal protection rights apply to civil litigants as well as criminal defendants. Accordingly, the equal protection rationale underlying *Batson* does not stem from any rights or protections afforded to a criminal defendant that are not afforded to a civil litigant. The Court in *Batson* based its holding on three basic principles. First, the Court stated that "[c]ompetence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. A person's race simply 'is unrelated to his fitness as a juror'" 476 U.S. at 87, 106 S.Ct. at 1718 (citations omitted). Second, the Court stated that a prosecutor shall not be allowed to assume that a juror of the defendant's race will be partial to the defendant simply because of their shared race. *Id.* at 97, 106 S.Ct. at 1723. Finally, the Court reasoned that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* at 87, 106 S.Ct. at 1718. It is obvious that these three principles are not dependent upon the fact that the jurors in

---

the laws expressed in the fourteenth amendment has been found by implication in the due process clause of the fifth amendment, which applies to federal action. *Johnson v. Robison,* 415 U.S. 361, 364, 94 S.Ct. 1160, 1164 n. 4, 39 L.Ed.2d 389 (1974); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

**5.** The Court declined to express a view on the merits of Batson's sixth amendment arguments. 476 U.S. at 84, 106 S.Ct. at 1716 n. 4. Recently,

in *Holland v. Illinois,* — U.S. —, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), the Court held that the fair cross section requirement of the sixth amendment does not prevent either side in a criminal prosecution from exercising its peremptory challenges in order to exclude cognizable racial or other groups from the petit jury as long as the venire itself is drawn from a fair cross section of the community.

*Batson* were being selected to sit for a criminal trial rather than a civil trial. Because the rationale of *Batson* is not inherently dependent upon the fact that *Batson* was a criminal proceeding, it is only logical to conclude that the Supreme Court would not intend the equal protection requirements of *Batson* to be limited to criminal cases.

This conclusion does not end our analysis, however, for the Constitution does not forbid private persons from discriminating. For a civil litigant to invoke the requirements of the equal protection clause, the litigant must show that the alleged discriminatory act is "state action" subject to the dictates of the Constitution. State action is readily apparent in the context of a criminal case; for there, a representative of the state—the prosecutor—exercises the peremptory challenge. However, state action is not so obvious in a civil case where the party utilizing the peremptory challenge is often a private individual, not a representative of the state. But the fact that a private litigant exercises a peremptory challenge does not automatically make that act private. As the level of interaction and cooperation between private individuals and the state rises—as it does in the jury selection process—it becomes increasingly difficult to discern precisely where private conduct ends and state action begins. In this case, Frank's, a private litigant, is the alleged discriminatory actor. For *Batson* to apply in this situation, the alleged discriminatory act—Frank's exercise of a peremptory challenge—must fairly be said to be conduct attributable to the state. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court established a two-part framework for determining the presence or absence of state action. The first part asks whether the claimed constitutional deprivation has resulted from the exercise of a right or privilege having its source in state authority. *Id.* at 937, 102 S.Ct. at 2753–54. As Frank's concedes, this requirement is clearly satisfied here.

Specifically, 28 U.S.C. § 1870 provides that each party in a civil case shall be entitled to three peremptory challenges. The crucial question is whether the Dunhams can establish *Lugar*'s second requirement: under the facts of a given case, can the party charged with the deprivation appropriately be characterized as a "state actor"? *Id.* The Court emphasized that a private party who exercises a right having its source in state authority—*Lugar*'s first requirement—is not considered a state actor—*Lugar*'s second requirement—absent "something more." *Id.* at 937–39, 102 S.Ct. at 2754.

Determining what constitutes "something more" is far from a precise task. In *Lugar*, the Court referred to its own use of several different tests in making this determination, including the "public function" test, *see Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); the "state compulsion" test, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); the "nexus" test, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Burton v. Wilmington Parking Auth., supra;* and the "joint action" test, *see Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The Court questioned whether these tests are actually different in operation or are simply different ways of "characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation." *Lugar*, 457 U.S. at 939, 102 S.Ct. at 2755. The Court concluded that, in the final analysis, the state action determination must be based on the specific facts and the entire context of a given case. " 'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in ₋private conduct be attributed its true significance.' " *Id.* (citing *Burton*, 365 U.S. at 722, 81 S.Ct. at 860).

At the outset of this "necessarily fact-bound inquiry," it is instructive to examine

the key facts of relevant precedents in which the Court has traced the line that separates private conduct from government action. In *Shelley v. Kraemer, supra*, the Court established that the equal protection clause forbids judicial enforcement of private, racially restrictive covenants. The Court held that enforcement of such private agreements by judicial officers in their official capacities amounted to state action. The Court applied a but for analysis, reasoning that, absent the intervention of the enforcing court, supported by the full panoply of state power, the persons excluded by the covenants would have been free to occupy the properties at issue. 334 U.S. at 19, 68 S.Ct. at 845.

In *Burton v. Wilmington Parking Auth., supra*, the Court found that the state acted when a privately owned restaurant located in a state owned and operated parking garage refused to serve a black would-be-patron. Although the decision to discriminate was made by the restaurant owner, a private concern, the Court reasoned that the state could have affirmatively required the restaurant not to discriminate as a precondition to renting space in the parking garage. 365 U.S. at 725, 81 S.Ct. at 861–62. The Court reasoned that through its inaction, the state elected to place its power, property and prestige behind the admitted discrimination. The Court concluded that regardless of the state's motive, it was not allowed to effectively abdicate its responsibility to prohibit racial discrimination occurring on its property. *Id.*

Recently, in *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988), the Court concluded that the activities of a probate court in a dispute between private parties caused the acts of one party to amount to state action. *Tulsa* involved a provision of the Oklahoma Probate Code barring creditor claims against an estate unless those claims are presented to the estate no later than two months after the estate notifies creditors that probate proceedings had commenced. A creditor who failed to comply with the two month requirement contended that the estate's noti-

fication did not comply with the requirements of the due process clause because the estate provided only publication notice to creditors as opposed to personal notice. *Id.* at 479–81, 108 S.Ct. at 1341–43.

The Court held that the estate's act of providing notice was an act that could be attributed to the government because of the probate court's role in the notification process in particular and the probate process in general. Specifically, the Court emphasized that the two month time bar did not begin to run until the probate court appointed an executrix and required her to file a copy of the estate's notice and an affidavit stating that the notice had been published. The Court reasoned that the role of the probate court was "so pervasive and substantial that it must be considered state action subject to the restrictions of the Fourteenth Amendment." *Id.* at 487, 108 S.Ct. at 1345–46. The Court concluded that whenever "private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." *Id.* at 486, 108 S.Ct. at 1345.

■ We now turn to whether there was state action in this case. The key is to determine whether the trial court's participation in Frank's exercise of its peremptory challenge is substantially different than the state's involvement in *Shelley, Burton,* or *Tulsa.* In holding that state action is absent in a civil case, Judge Thomas Gibbs Gee, writing for the *en banc* panel of the Fifth Circuit in *Edmondson,* characterized the role of a trial judge as follows:

[t]he merely ministerial function exercised by the judge in simply permitting the venire members cut by counsel to depart is an action so minimal in nature that one of less significance can scarcely be imagined. No exercise of judicial discretion is involved, rather a mere standing aside; so that the fault—if it is a fault—lies with the system which permits such challenges, not with the judge's mere ministerial compliance with what the rule requires.

895 F.2d at 221–22 (footnotes omitted). Judge Gee reasoned that this "mere standing aside" cannot constitute "action" in light of Supreme Court pronouncements that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement ... that the choice must ... be deemed to be that of the State," *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (citing cases), and that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the ... Fourteenth Amendment." *Id.* (citing cases).[6]

While the approach of the Fifth Circuit is certainly plausible, we believe that Supreme Court precedent requires a different characterization of the role of a trial judge in the peremptory challenge process. Analogizing to *Shelley, Burton,* and *Tulsa,* we are unable to characterize a judge's role as that of a "ministerial bystander."[7] Admittedly, this case is different than *Shelley* in one key respect—a judge enforcing peremptory challenges, unlike a judge enforcing racial covenants, does not exercise judicial discretion; once a private litigant exercises a peremptory challenge, the judge has no choice but to excuse the stricken panel member. However, in applying a but for analysis in *Shelley,* the Court focused on a court's coercive powers, not its discretionary powers. A similar but for analysis is applicable here. Like the racial covenants in *Shelley,* enforcement of a peremptory strike is ultimately dependent upon the judge's coercive powers. When a private litigant peremptorily challenges a panel member, that challenge is not self-effectuating. The litigant may exercise the peremptory challenge—but it is the presiding judge who then exercises his authority to excuse the juror from service. All jurors are under the control of the presiding judge during the course of the trial. It is this control over the jury and its selection procedures, inherent in the powers of a federal judicial officer, which demonstrates that the ultimate enforcer of a peremptory challenge is the trial judge; enforcement is not dependent upon an agreement between the private parties.

In excusing a juror, the state, no less than in *Burton,* places its power and prestige behind the admitted discrimination. In addition, peremptory challenges are invoked in a courtroom operated by the government. If the Court in *Burton* did not allow the state to abdicate its responsibility to prohibit racial discrimination in a parking garage, it only seems logical that the Court would not allow the state to abdicate this responsibility in a court of law.

Up to this point, we have focused only on the function of a trial judge in excusing a juror pursuant to a private litigant's peremptory challenge. In finding state action in *Tulsa,* however, the Court did not limit its focus to the role of the probate court in the process by which the estate provided notice; rather, the Court emphasized the importance of the probate court's overall involvement in the probate proceedings. Likewise, our state action inquiry should focus on the overall involvement of the trial court in the jury selection process. The role of a federal district court in the jury selection process appears to be at least as pervasive as the role of the probate court in *Tulsa.* Congress determines the qualifications for jury service and the method of summoning jury panels; the district court, in turn, enforces these standards. 28 U.S.C. § 1865. In order to avoid discrimination in the selection of jury venires, Congress also requires each district

---

**6.** The facts of *Blum v. Yaretsky, see accompanying text,* are not pertinent to our case. Unlike this case, the private action at issue in *Blum* failed to satisfy *Lugar*'s first prong. In *Blum,* the Court noted that it was dealing with a case "obviously different from those cases in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the State so as to make it

'state' action for purposes of the Fourteenth Amendment." 457 U.S. at 1003, 102 S.Ct. at 2785.

**7.** The portion of the *en banc* opinion in *Edmonson* pertaining to state action does not discuss *Shelley, Burton,* or *Tulsa. See Edmonson,* 895 F.2d at 221–22.

court to devise and enforce a plan for random jury selection. 28 U.S.C. § 1863. The clerk of the district court summons the venire to appear in court at a particular time and place. Of course, jury service in the federal system is not optional—if not excused by the district court, a summoned juror must fulfill jury duty.

In regard to the exercise of peremptory challenges, there are several discretionary measures open to a judge which tend to belie the characterization of the judge as a "ministerial bystander." For example, while the number of peremptory challenges is determined by statute in single party civil cases, a trial judge has broad discretion in determining the appropriate number and allocation of peremptory challenges in multiparty civil cases. 28 U.S.C. § 1870. Perhaps more important, the trial judge indirectly determines the impact of any given number of peremptory strikes. Local court rules control the number of jurors empaneled in civil cases, thereby governing the relative effectiveness of peremptory challenges in determining the composition of a jury. The trial judge controls the conduct of voir dire and the range of information that may be discovered about a jury panel member, thus affecting the exercise of both challenges for cause and peremptory challenges. In addition, the judge has broad discretion over whether or not to excuse a juror for cause, thus determining the number of jurors who remain eligible for the exercise of peremptory strikes.

Finally, a trial judge enjoys broad discretion in determining the manner in which peremptory challenges are exercised: he can decide which party exercises the last challenge; he can require the parties to exercise their challenges simultaneously in writing; or he can require one party to exercise all of its challenges first, thereby allowing the other party to act with full knowledge of its opponent's choices.

We do not think the role of the trial court in Frank's peremptory strike is significantly different than the role of the state in *Shelley*, *Burton*, or *Tulsa*. Accordingly, we conclude that the requisite state action is present in this case.

There is one final point we should address, however: the *en banc* court in *Edmonson* noted that the Court in *Batson* declined to hold that the equal protection clause prohibits defense counsel in a criminal case from exercising peremptory challenges on racial grounds. 895 F.2d at 222. The *en banc* court hinted, and Frank's now argues, that the Court's failure to so hold is inconsistent with the view of the trial court as state actor. *Id.* We disagree. The Court in *Batson* explicitly declined to express a view one way or the other on whether the Constitution imposes any limits on the exercise of peremptory challenges by defense counsel. 476 U.S. at 89 n. 12, 106 S.Ct. at 1719 n. 12. Thus, it is clear that the Court in *Batson* did not address the issue of whether the trial court supplies the necessary state action in the context presented in this case.

Since *Batson* was decided in 1986, a debate has ensued as to whether it makes sense to allow a right to peremptory challenges—a device admittedly intended to allow a party to strike a potential juror for any reason, be it a hunch, an assumption or an intuitive judgement—once the Supreme Court created an equal protection exception to that right. One thing is certain—the future viability of peremptory challenges is quite uncertain. As of this date, the Supreme Court has not made clear whether the equal protection rationale of *Batson* forbids the exercise of peremptory challenges with regard to other cognizable categories such as sex, ethnic origin, religion and so on. *See Batson*, 476 U.S. at 124, 106 S.Ct. at 1737 (Burger, C.J., dissenting). Some propose that we should completely abolish peremptory challenges (as they have in England), *see Batson*, 476 U.S. at 106–08, 106 S.Ct. at 1728–29 (Marshall, J., concurring), while others argue that we should restore peremptory challenges to the pre-*Batson* right with no exceptions. Regardless of what position one favors, the current status of the law—peremptory challenges which are not truly peremptory, with exceptions for some reasons but not others—hardly seems satisfactory. *See United States v. Clark*, 737 F.2d 679, 682 (7th Cir.1984) (Posner, J.) (permitting in-

quiry into the basis for a peremptory challenge causes it to collapse into a challenge for cause); Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges and the Review of Jury Verdicts*, 56 U.Chi.L.Rev. 153 (1989).

For our purposes today, however, the debate over the partial invalidation of peremptory challenges was resolved by the Supreme Court in *Batson*; thus, our views on its merits are irrelevant to deciding this appeal. Our basic task has been to determine the presence or absence of state action. Having found the requisite state action, we are bound to hold that the requirements of *Batson* apply to Frank's use of its peremptory challenge. Accordingly, we must remand this case to the district court for it to determine whether the Dunhams can establish a prima facie case of racial discrimination. If the Dunhams establish a prima facie case, then the district court must require Frank's to show that it had some neutral, that is, non-racial reason for its challenge. If Frank's does not come forward with a non-racial explanation for its challenge, the district court shall order a new trial.

The case is REMANDED for further proceedings consistent with this opinion.

RIPPLE, Circuit Judge, dissenting.

Since the Supreme Court's decision in the *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), "the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may be fairly said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1947). The majority ignores this "firmly embedded" principle. Because *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), does not require us to find that state action exists when private litigants

exercise peremptory challenges in civil actions, and because both Supreme Court and Seventh Circuit precedent mandate that no state action is present under these circumstances, I respectfully dissent.

I

**A.** *The Road to Batson*

The line of precedent culminating in *Batson* has its genesis in *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). In *Strauder*, a black criminal defendant, Strauder, was charged with murder. Pursuant to a West Virginia statute limiting jury service to white males,[1] the venire summoned for the trial was composed exclusively of white men. Before jury selection began, Strauder objected and argued that the state law did not afford him equal protection of law by prohibiting blacks from jury service. The trial court overruled his objection; the all-white jury convicted Strauder of murder. *Id.* at 304. The Supreme Court of West Virginia affirmed Strauder's conviction. *See State v. Strauder*, 11 W.Va. 745 (1877).

The United States Supreme Court granted certiorari to determine whether, under the fourteenth amendment, all blacks "may be excluded by law, solely because of their race or color, so that by no possibility can any colored man sit upon the jury." *Strauder*, 100 U.S. at 305. The Court held that the fourteenth amendment "was designed to assure to the colored race the enjoyment of all the civil rights that under law are enjoyed by white persons" and to deny "any State the power to withhold from them the equal protection of the laws...." *Id.* at 306. Consequently, the Court determined that the West Virginia statute did not afford blacks equal legal protection, and therefore violated the fourteenth amendment. Central to the Court's decision was the proposition that, if blacks were to be protected from the racial prejudice that the fourteenth amendment was designed to eliminate, blacks must be eligible for jury service:

1. The West Virginia statute provided as follows: "All white male persons who are twenty-one years of age and who are citizens of this State

shall be liable to serve as jurors, except as herein provided." The exceptions were for State officials. 100 U.S. at 305.

And how can it be maintained that compelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is not a denial to him of equal legal protection?

*Id.* at 309.

The Supreme Court was again confronted with an impediment to the participation of blacks on juries in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain,* the petitioner was convicted of rape and sentenced to death. Swain challenged the jury selection process. He claimed that the prosecutor's use of peremptory challenges to remove all of the black members from the venire constituted a denial of equal protection of law.[2] As further evidence of the equal protection violation, Swain noted that the state had used its peremptory challenges to remove all blacks who had been summoned for jury duty during the past twelve years. The Court refused to overturn Swain's conviction. In addressing the challenge to the prosecutor's use of the state's peremptory challenges, the Court presumed that the prosecutor was "acting on acceptable considerations related to the case he [was] trying, the particular defendant involved. and the particular crime charged." *Id.* at 223, 85 S.Ct. at 837. The Court found that this presumption was warranted "[i]n light of the purpose of the peremptory system and the function it serves in a pluralistic

society in connection with the institution of jury trial." *Id.* at 222, 85 S.Ct. at 837.

Although "[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges," *Stilson v. United States,* 250 U.S. 583, 586 [40 S.Ct. 28, 30, 63 L.Ed. 1154], nonetheless the challenge is "one of the most important of the rights secured to the accused," *Pointer v. United States,* 151 U.S. 396, 408 [14 S.Ct. 410, 414, 38 L.Ed. 208]. The denial or impairment of the right is reversible error without a showing of prejudice, *Lewis v. United States,* [146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011]; *Harrison v. United States,* 163 U.S. 140 [16 S.Ct. 961, 41 L.Ed. 104]; *cf. Gulf, Colorado & Santa Fe R. Co. v. Shane,* 157 U.S. 348 [15 S.Ct. 641, 39 L.Ed. 727]. "For it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." *Lewis v. United States, supra* [146 U.S.], at 378 [13 S.Ct. at 139].

*Swain,* 380 U.S. at 219, 85 S.Ct. at 835.

In the Court's view, it was inappropriate to examine the prosecutor's reasons for the exercise of his challenges. "Negro and white, Protestant and Catholic, are alike subject to being challenged without cause." *Id.* at 221, 85 S.Ct. at 836. Indeed, the Court stated that "[t]he essential nature of the peremptory challenge is that it is one exercised without a reason stated, *without inquiry and without being subject to the court's control."*[3] *Id.* at 220, 85 S.Ct. at

---

**2.** Contrary to the Eleventh Circuit's assertion in *Fludd v. Dykes,* 863 F.2d 822, 826 (11th Cir.) (emphasis supplied), *cert. denied,* —— U.S. ——, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989), Swain did not claim "that the *trial judge* denied him the equal protection of laws *when he permitted the prosecutor* to exercise the state's peremptory challenges to rid the venire of blacks because of their race." Rather, Swain's challenge, and the Court's analysis, focused on the *prosecutor's* use of peremptory challenges in the Alabama jury system.

The Alabama "struck jury" system operated as follows: in a criminal case, about 35 people were drawn to comprise the petit jury venire. If a capital offense was involved, about 100 were drawn. "After excuses and removals for cause, the venire in a capital case is reduced to

about 75. The jury is then 'struck'—the defense striking two veniremen and the prosecution one in alternating turns, until only 12 jurors remain." *Swain v. Alabama,* 380 U.S. at 210, 85 S.Ct. at 830.

**3.** This statement clearly demonstrates that the Court does not consider the present peremptory challenge system to be within the control of the trial court. Because the court has no control over the use of peremptory challenges, any action taken by the trial court must be classified as "merely ministerial." *See Edmonson v. Leesville Concrete Co.,* 895 F.2d 218, 221 (5th Cir. 1989) (en banc),. *cert. granted,* —— U.S. ——, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990).

That the Court distinguished between judicial "inquiry" and "control" is also significant. The

836 (emphasis supplied). Therefore, the court found that there must be a presumption that the prosecutor was using his peremptory challenges to secure an impartial jury. This presumption was not overcome, and the prosecutor subject to examination concerning the use of his peremptory challenges, "by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it." *Id.* at 222, 85 S.Ct. at 837.

The Court did, however, establish an evidentiary framework that might be employed by defendants to challenge the use of peremptory challenges. Basically, the defendant was required to show that peremptories were being used by the prosecutor to disqualify blacks generally from jury service before the defendant could mount a successful equal protection challenge under *Swain*. As the Court later noted in *Batson*, in response to *Swain*, lower courts required the defendant to demonstrate repeated striking of blacks over a number of cases to establish an equal protection violation. *See Batson*, 476 U.S. at 92, 106 S.Ct. at 1721. "Since this interpretation of *Swain* has placed on defendants a crippling burden of proof, prosecutors' peremptory challenges are now largely immune from constitutional scrutiny." *Batson*, 476 U.S. at 92–93, 106 S.Ct. at 1720–21.

### B. *Batson v. Kentucky: Easing the evidentiary burden*

James Batson, a black male, was indicted for receiving stolen goods and for burglary. The prosecutor struck all four blacks from the venire; an all-white jury was selected. Batson moved to discharge the jury on the ground that the prosecutor's removal of the black veniremen violated his rights under the equal protection guaran-

tee of the fourteenth amendment. The trial judge denied the motion. The jury convicted Batson. The Kentucky Supreme Court affirmed the conviction; it held that *Swain* required a defendant alleging a lack of a fair cross section to demonstrate systematic exclusion of a group of jurors from the venire. *Batson*, 476 U.S. at 82–84, 106 S.Ct. at 1714–16.

The Supreme Court reaffirmed the principle established in *Swain* that a prosecutor's use of peremptory challenges to exclude systematically blacks from serving as jurors could violate the equal protection clause of the fourteenth amendment. In order to establish a prima facie case of discrimination in the selection of the venire, the defendant must demonstrate that he is a member of a group capable of being separated for differential treatment and must show discrimination against veniremen of his race. To show discrimination, the defendant may prove systematic exclusion of the members of his race in his jurisdiction—the *Swain* standard. *Id.* 476 U.S. at 94, 106 S.Ct. at 1721. However, "[s]ince the ultimate issue is whether the state has discriminated in selecting the defendant's venire, ... the defendant may establish a prima facie case 'in other ways than by evidence of long-continued unexplained absence' of members of his race 'from many panels.'" *Id.* at 95, 106 S.Ct. at 1722, (quoting *Cassell v. Texas*, 339 U.S. 282, 290, 70 S.Ct. 629, 633, 94 L.Ed. 839 (1950) (plurality opinion)). Therefore, the Court implemented a less demanding process of proof. A defendant could make a prima facie showing of discrimination solely on the basis of the prosecutor's use of peremptory challenges at the defendant's trial. A defendant must demonstrate only that the use of peremptory challenges, and any circumstances relevant in his case, raises an inference that the prosecutor

---

statement implies that even if a court were to inquire into the nature of the peremptory challenge, the court would still possess no control over the peremptory challenge. Thus, the court's role would still be characterized as ministerial.

From these statements, it is clear that the Supreme Court's decision in *Batson* was not

based on the power of the trial judge. Rather, it is the prosecutor who is the state actor. It is also clear that even in a *post-Batson* criminal trial where the court inquires into the reasoning of the prosecutor for the use of a peremptory challenge, the Supreme Court would not consider the trial judge to be a state actor for the purposes of equal protection analysis.

used the peremptories to exclude veniremen because of their race. *Id.* 476 U.S. at 93–96, 106 S.Ct. at 1721–23. After the defendant makes a prima facie showing, the burden shifts to the prosecutor to advance a neutral explanation for challenging the jurors. Although the prosecutor's explanation need not rise to the level of a challenge for cause, the prosecutor must do more than merely affirm his good faith; the prosecutor "must articulate a neutral explanation related to the particular case to be tried." *Id.* at 98, 106 S.Ct. at 1724.

## C. *Applying Batson to civil cases*

In order to find the necessary state action to render the fourteenth amendment applicable in *Batson,* the Court clearly relied on the role that the *prosecutor* plays in exercising peremptory challenges. The defendant makes a prima facie case based on "evidence concerning the *prosecutor's* exercise of peremptory challenges" by showing "that the *prosecutor* has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723 (emphasis supplied). The defendant's allegation must raise "an inference that the *prosecutor* used" his peremptory challenges to exclude veniremen because of their race. "The *prosecutor* ... must [then] articulate a neutral explanation" to rebut the defendant's case. *Id.* at 98, 106 S.Ct. at 1724 (emphasis supplied).

The role of the trial judge in the peremptory challenge process was not perceived by the Court in *Batson* to constitute state action. The Court expressly reserved judgment on whether strikes by defense counsel in a criminal case could implicate the fourteenth amendment. *Id.* at 89 n. 12, 106 S.Ct. at 1719 n. 12. As the Fifth Circuit has noted, it is difficult "to see how the Supreme Court could have reserved judgment, as it purported to do in *Batson,* on the strikes by defense counsel, if the 'actor' was the judge." *Edmonson v. Leesville*

*Concrete Co.,* 895 F.2d 218, 222 (5th Cir. 1989) (en banc), *cert. granted,* —— U.S. ——, 111 S.Ct. 41, 112 L.Ed.2d 18 (1990); *see also Wilson v. Cross,* 845 F.2d 163, 164–65 (8th Cir.1988) ("we have strong doubts about whether *Batson* was intended to limit the use of peremptory challenges in civil cases").

That the Court based its analysis on the role of the prosecutor is more than clear; it is also sensible. In criminal cases, the entire proceeding is "commenced and carried through by the prosecuting attorney, the very embodiment of the state's power...." *Edmonson,* 895 F.2d at 221. Indeed, the Court found the prosecutor so closely related to the State that the Court used the terms "prosecutor" and "State" interchangeably: "Once the defendant makes a prima facie showing, the burden shifts to the *State* to come forward with a neutral explanation for challenging black jurors.... [W]e emphasize that the *prosecutor's* explanation need not rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

In sum, the Supreme Court's focus on the prosecutor in *Batson* is the natural outgrowth of the Court's earlier precedent. *Strauder* began by finding that states could not bar black citizens from participating in the administration of criminal justice. *Swain,* while setting very high evidentiary standards, attempted to prevent states from accomplishing this same purpose through the use of peremptory challenges. In *Batson,* the Court simply lowered the height of the evidentiary hurdles that defendants need to clear in order to establish equal protection violations in criminal cases.[4] Nothing more, nothing less. Therefore, *Batson,* by its own terms, is inapplicable to civil cases.

Apparently conceding that nothing in *Batson* explicitly supports an extension into the civil trial, the majority turns to a

---

4. Justice Powell's opinion in *Batson* expressly states that its scope is limited to a reexamination of "that portion of Swain ... concerning the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race" from the jury. *Batson,* 476 U.S. at 82, 106 S.Ct. at 1714–15.

more nebulous argument—that *Batson* is not inherently dependent upon the fact that it was a criminal proceeding, and that its equal protection requirements should therefore extend to civil cases. Yet *Batson* is inherently dependent upon the fact that it was a criminal trial. Criminal and civil trials are simply different. In a criminal trial, the state, through its prosecutor, wins when justice is done.[5] The civil advocate wins only if the verdict is favorable to his client. In a criminal prosecution, the government is directly involved in the proceeding. The government appears in the person of the prosecutor, a person clearly clothed with the authority of the state and without counterpart in civil litigation. "But, more fundamentally, the entire purpose of a criminal prosecution is to enforce the purposes of the state, whereas the state has no purpose at all in civil litigation beyond preempting the use of private force to settle disputes—a purpose that is as well served, if the parties consent, by an arbitration to which the state is no party." *Edmonson*, 895 F.2d at 223.

This fundamental difference with respect to the role of the government in criminal cases has long been recognized by both the legislative and judicial branches of government. Congress has recognized that different interests are at stake in criminal and civil trials by providing differing numbers of peremptory challenges.[6] In criminal trials, the state puts the defendant's life and liberty interests at stake. The defendant can face imprisonment or even death.[7] The Court has treated criminal and civil cases differently in other contexts. For example, the equal protection clause requires government to provide indigent-defendants with counsel through a first appeal.[8] Similarly, the Court has required the government to waive filing and transcript fees for indigent-defendants.[9] Indigents in civil trials enjoy no such entitlement.[10] Thus, extending *Batson* to civil cases requires us to ignore the very real differences between the state's role in criminal and civil cases.[11]

5. *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."), *overruled on other grounds, Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

6. 28 U.S.C. § 1870 governs the number of peremptory challenges allotted in a federal civil case: "In a civil case, each party shall be entitled to three peremptory challenges."
   The use of peremptory challenges in criminal cases is governed by Fed.R.Crim.P. 24(b), which provides as follows:
   If the offense charged is punishable by death, each side is entitled to 20 peremptory challenges. If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges. If the offense charged is punishable by imprisonment for not more than one year or by fine or both, each side is entitled to 3 peremptory challenges....

7. Thus, Congress permits each side 20 peremptory challenges if the offense is punishable by death; the government receives 6 and the defendant 10 peremptory challenges if the offense is not punishable by death. The civil litigant's

interests, while important, do not rise to the level of the criminal defendant's interests. Accordingly, Congress has provided that each side should receive only three peremptory challenges.

8. *See Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974); *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

9. *See Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

10. *See United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (waiver of filing fee in bankruptcy proceeding not required under equal protection); *Ortwein v. Schwab*, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) (upholding state filing fees for appellate court review of agency's reduction in welfare payments).

11. At least one federal district court has noted a further distinction between civil and criminal trials. In *Esposito v. Buonome*, 642 F.Supp. 760 (D.Conn.1986), the court held *Batson* inapplicable to civil cases. The court reasoned that a criminal defendant is entitled to more protection than a civil plaintiff because the criminal defendant is an involuntary participant in the trial and has no choice in the forum. A civil plaintiff, however, initiates the judicial process, chooses the forum, and, in some cases, chooses whether to have a jury. *Id.* at 761.

Applying *Batson* to civil cases also requires a rejection of the Supreme Court's characterization of peremptory challenges. "The *essential nature* of the peremptory challenge is that it is one exercised ... *without being subject to the court's control.*" *Swain,* 380 U.S. at 220, 85 S.Ct. at 836 (emphasis supplied). "The merely ministerial function exercised by the judge in simply permitting the venire members cut by counsel to depart is an action so minimal in nature that one of less significance can scarcely be imagined." *Edmonson,* 895 F.2d at 221. Because the trial court has no control over the peremptory challenge, determining that the trial judge's acquiescence constitutes state action requires a radical liberalization of the state action requirement. Such a liberalization also requires a rejection of the Court's statements in *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (citations omitted), that government "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement ... that the choice must ... be deemed to be that of the State" and that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."

## II

Unable to find any tangible support within *Strauder, Swain,* or *Batson* for the proposition that the trial judge is a state actor when he dismisses a juror after a peremptory challenge (and ignoring clearly marked signs to the contrary), the panel majority retreats into the jungle of Supreme Court decisions dealing with the state action doctrine. The majority fairly states the issue: Frank's, a private litigant, is the alleged discriminatory actor. To find the requisite state action necessary to apply the equal protection constraints of the fourteenth amendment to peremptory challenges, the alleged discriminatory act—Frank's exercise of a peremptory challenge—must fairly be said to be conduct of the state. *Ante* at 1284.

"Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the state, its agencies or officials, responsibility for conduct for which they cannot be fairly blamed." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). *Lugar* established a two-prong test to determine whether "the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State." *Id.* at 937, 102 S.Ct. at 2753. The first prong of the *Lugar* test requires that the "claimed deprivation ... result[] from the exercise of a right or privilege having its source in state authority." *Id.* at 939, 102 S.Ct. at 2755. As Frank's concedes here, and the majority correctly notes, this first prong is clearly satisfied—28 U.S.C. § 1870 provides that each party in a civil case is entitled to three peremptory challenges. *See also Edmonson,* 895 F.2d at 221 (holding first *Lugar* requirement satisfied in civil trials).

*Lugar* 's second prong examines whether the private party "has acted together with or has obtained significant aid from state officials, or [whether] his conduct is otherwise chargeable to the State." *Lugar,* 457 U.S. at 937, 102 S.Ct. at 2754. The second prong is crucial: without it, "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Id. Lugar* thus states that mere action by a private party pursuant to a statute, "without something more," does not justify characterizing that party as a state actor. *Id.* at 939, 102 S.Ct. at 2754. The Court described the inquiry into whether "something more" is present as "necessarily factbound." [12] *Id.* Nevertheless, the majority

---

**12.** The majority correctly cites the various factors and tests, mentioned by the Court in *Lugar,* as relevant in past Supreme Court decisions. *Ante* at 1284–85. But the majority fails to mention the Court's statement that "we do not hold today that 'a party's mere invocation of

selects three cases as "relevant precedents" that establish the frontier between state action and private conduct.

In *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the Shelleys, a black family, purchased a home in St. Louis, Missouri, from Fitzgerald, a willing seller. Almost two months later, several nearby landowners brought suit to divest title to the property from the Shelleys and to revest title in Fitzgerald. The suit was based on a racially restrictive covenant that had been signed by most of the landowners in the area; Fitzgerald's land was subject to the covenant. The trial court denied the requested relief. *Id.* at 4–5, 68 S.Ct. at 838. When the court rendered its decision, the Shelleys were occupying the property in question. *Id.* at 6, 68 S.Ct. at 839. The Supreme Court of Missouri reversed and directed the trial court to revest title in Fitzgerald. The state supreme court found that the racially restrictive agreement was enforceable and violated no federal constitutional provision. The Supreme Court of the United States reversed. It held that judicial enforcement of racially restrictive covenants violated the equal protection clause. The Court reasoned that state court action was not "immunized" from the operation of the fourteenth amendment, and thus judges could be state actors. *Id.* at 18, 68 S.Ct. at 844. Because this case required "the active intervention of the state courts, supported by the full panoply of state power," to displace the Shelleys from their home, state action existed. *Id.* at 19, 68 S.Ct. at 845.

The majority concedes that *Shelley* is different from this case "in one key respect—a judge enforcing peremptory challenges, unlike a judge enforcing racial covenants, does not exercise judicial discretion; once a private litigant exercises a peremptory challenge, the judge has no choice but to excuse the stricken panel member." *Ante* at 1286. The majority contends, however, that *Shelley* was based on the court's "coercive" power. But, here too, there is a very substantial difference between *Shelley* and peremptory challenges in a civil case. Although the coercive power of the state court was undoubtedly important to the Supreme Court's decision, the coercion in *Shelley* was of an entirely different character than any "coercion" present in the context of peremptory challenges. In *Shelley*, the Shelleys were already living in the house. To remove them, the court, through the use of its injunctive power, necessarily would have had to give effect to a facially discriminatory covenant— where it had the discretion not to so enforce. The court would have utilized "the full panoply of state power" to displace the Shelleys. Finally, the court would have ordered the revesting of the property to Fitzgerald.

The degree of judicial coercion in *Shelley* stands in stark contrast to the judicial involvement in the peremptory challenge. The judge has no discretion to reject the peremptory challenge. A peremptory challenge is not facially discriminatory. A judge does not render a decision or issue an order in a peremptory challenge. And most importantly, the judge takes no af-

---

state legal procedures constitutes "joint participation" or "conspiracy" with state officials satisfying the § 1983 requirement of action under color of law.'" *Lugar,* 457 U.S. at 939 n. 21, 102 S.Ct. at 2755 n. 21. The inquiry as to whether a private person's actions are performed under color of state law is identical to the state action determination. *Id.* at 928, 102 S.Ct. at 2749; *see also United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1965) (action "'under color' of state law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment").

The majority in *Lugar* was responding to Justice Powell's dissent. Justice Powell, the author

of *Batson,* had argued that "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge." *Lugar,* 457 U.S. at 951, 102 S.Ct. at 2761 (Powell, J., dissenting), (quoting *Dennis v. Sparks,* 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980)). Justice Powell further noted that "invocation of the state legal process is 'essentially a private function ... for which state office and authority are not needed.'" *Id.* (quoting *Polk County v. Dodson,* 454 U.S. 312, 319, 102 S.Ct. 445, 450, 70 L.Ed.2d 509 (1981)). Moreover, Justice Powell added that "independent, private decisions made in the context of litigation cannot be said to occur under color of law." *Id.*

firmative, enforcement role in the peremptory challenge process. *Shelley* simply does not stand for the proposition that *all* judicial action constitutes state action. It should not be read so broadly. As commentators have cautioned:

> If Shelley were read at its broadest, a simple citation of the case would have disposed of most subsequent cases. Some seemingly "neutral" state nexus can almost always be found.... Given the entanglement of private choices with law, a broad application of Shelley might in effect have left no private choices immune from constitutional restraints.

G. Gunther, Constitutional Law 879 (11th ed. 1985).[13] *Shelley* merely recognized that judicial action was not "immunized" from constituting state action. This is a far cry from finding state action on the vague basis of the "inherent ... powers of a federal judicial officer." *Ante* at 1286. Indeed, if the judicial action in excusing a juror after private counsel exercises a peremptory challenge is state action, then virtually all judicial conduct must establish state action.

> If the judge is the actor, then, and if his mere excusing of veniremen who have been peremptorily challenged from further attendance at court be deemed an "act," it follows that every aspect of every civil trial, state and federal, is constitutionalized—a quantum procedural leap that we leave for the Supreme Court to make, should it wish to do so.

*Edmonson*, 895 F.2d at 222; *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 165, 98 S.Ct. 1729, 1738, 56 L.Ed.2d 185 (1977) ("If the mere denial of judicial relief is considered sufficient encouragement to make the State responsible for those private acts, all private deprivations of property would be converted into public acts whenever the State, for whatever reason, denies relief....").

The Supreme Court "has never held that a State's mere acquiescence in a private action converts that action into action of the State." *Flagg Bros.*, 436 U.S. at 164, 98 S.Ct. at 1737. In *Flagg Bros.*, the Court considered whether a warehouseman's proposed sale of goods entrusted to him for storage, as permitted by the New York Uniform Commercial Code, was state action. The plaintiffs argued that state action existed because the State had authorized and encouraged the sale by enacting the Uniform Commercial Code. The Court found no state action, holding that the fourteenth amendment was inapplicable where plaintiffs characterize the state's inaction as "authorization" or "encouragement." *Id.* at 164–65, 98 S.Ct. at 1737–38.

In the present case, the Dunhams contend that the trial judge's failure to inquire into the reasons for a private litigant's exercise of a peremptory challenge constitutes state action. Thus the Dunhams' argument is not different from that advanced in *Flagg Bros.*: state action is present because the legislature encouraged the peremptory challenge by statutorily determining that civil litigants each receive three peremptories, and the court authorized these challenges even after the court received an objection. However, as in *Flagg Bros.*, a court's acquiescence in accepting the peremptory challenge does not convert private action into state action. Like the warehouseman's decision to sell the goods in his possession, a private litigant's decision to use a peremptory challenge is not properly attributable to the state. *Cf. Texaco, Inc. v. Short*, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982) (state's involvement in the mere running of a general statute of limitation generally insufficient to implicate due process).

---

**13.** *See also* J.E. Nowak, R.D. Rotunda, J.N. Young, Constitutional Law 498 (2d ed. 1983) ("The *Shelley* decision should not be taken as holding that any judicial decree which disadvantages members of a racial minority violates the fourteenth amendment.").

Professor Gunther's comment that some "state nexus can almost always be found" seems particularly accurate in light of the majority's peremptory challenge analysis. *See ante* at 1286–87 (finding judicial involvement in peremptory challenges constitutes state action because Congress establishes jury qualifications, judges determine the order in which parties exercise peremptory challenges, and judges have discretion whether to excuse a juror for cause).

In analogizing the judge's role in the peremptory challenge to *Shelley*, the majority overlooks *Evans v. Abney*, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1969), a case that is factually much closer to our case than *Shelley*. In *Evans*, a park was conveyed to a city for the exclusive use of white citizens. After the Supreme Court of the United States determined that the city could not operate the park in a racially discriminatory manner,[14] the state supreme court held that under state law the park reverted to the testator's heirs. Several black citizens who had originally attempted to integrate the park brought suit, alleging that the termination of the trust violated their right to equal protection. *Id.* at 437, 90 S.Ct. at 629. The Supreme Court of the United States upheld the state supreme court's decision. The Court reasoned that there was not the slightest indication that the judges were motivated by racial animus in construing the will, and that the racial restrictions were solely the product of a private choice. Moreover, both blacks and whites equally shared the loss of the park.

> Surely the Fourteenth Amendment is not violated where, as here, a state court operating in its judicial capacity fairly applies its normal principles of construction to determine the testator's true intent ... and then reaches a conclusion with regard to that intent which, because of the operation of neutral and nondiscriminatory state trust laws, effectively denies everyone, whites as well as Negroes, the benefits of the trust.

*Id.* at 446, 90 S.Ct. at 634.

The role of the trial judge in the exercise of a peremptory challenge is much like that described in *Evans*. There is not the slightest indication that judges are motivated by racial animus when they excuse a juror after a peremptory challenge. Any racial motivation underlying the private litigant's peremptory challenge is solely the product of a private choice. Judges simply discharge jurors because of the neutral, nondiscriminatory statute providing that private litigants receive peremptory challenges. Clearly, the factual similarities and reasoning of the Court in *Evans* provide a compelling argument that there is no state action when a judge excuses a juror after a peremptory challenge.

The majority next looks to *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), in its quest for the elusive "something more." *See Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. In *Burton*, the Court found state action present when a privately owned restaurant in a state-owned parking garage refused to serve blacks. The Court focused on several factors to determine the "nonobvious involvement of the State" in this case. *Id.* at 722, 81 S.Ct. at 860. First, the Wilmington Parking Authority (the Authority) completed construction of the premises without cost to the restaurant. Second, the lease contained no requirement that the restaurant serve the public on a nondiscriminatory basis, despite the Authority's power to adopt such rules. Third, the profits earned from the restaurant's discrimination were indispensable elements in the financial success of the Authority's parking garage. *Id.* at 719–24, 81 S.Ct. at 858–61. The Court thus concluded that "[t]he State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity...." *Id.* at 725, 81 S.Ct. at 862.

To find that the Court's state action determination in *Burton* is relevant to whether state action is present when a private litigant exercises a peremptory challenge is to ignore *Burton's* command: "'Differences in circumstances ... beget appropriate differences in law.'" *Id.* at 726, 81 S.Ct. at 862 (quoting *Whitney v. Tax Comm'n*, 309 U.S. 530, 542, 60 S.Ct. 635, 640, 84 L.Ed. 909 (1939)). The trial judge cannot seriously be characterized as one who has so insinuated himself into a position of interdependence that he must be considered a joint participant with the private litigant in the exercise of a perempto-

---

**14.** *See Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

ry challenge.[15] In light of the "necessarily fact-bound inquiry" that confronts a court when testing for state action, *Burton* is inapplicable to our case.

The majority's final stop in its quest for "something more" is *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988). In *Tulsa*, the Court examined the activities of a probate court in administering a provision of the Oklahoma Probate Code that barred creditor claims against an estate unless those claims were presented to the estate within two months after the estate notified creditors that probate proceedings had commenced. A creditor who had failed to file a timely claim contended that the estate's use of publication notice, instead of personal notice, to creditors did not comply with the due process clause. *Id.* 108 S.Ct. at 1341–43.

In determining whether sufficient state action was present to render the fourteenth amendment applicable, the Court determined that the probate court was intimately involved in the notification and probate process. The following factors were relevant to the Court's finding of state action: the court sets a hearing date after the initiation of the probate petition; the court mails notice of the hearing to all devisees, legatees, and heirs; the court has the discretion whether to admit the will to probate if no person contests the will at the hearing; after admitting the will to probate, the court appoints an executor; the court's appointment of the executor activated the

two month filing period; the court issues an order *expressly compelling* the executor to give immediate notice to creditors. *Id.* at 1342–45. The Court stated that "[p]rivate use of state sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the *overt, significant* assistance of state officials, state action may be found." *Id.* at 1345 (citations omitted) (emphasis supplied).

The acquiescence of the trial judge in a private litigant's exercise of a peremptory challenge is fundamentally—indeed qualitatively—different from the probate court's "overt, significant" involvement in every step of the probate process [16] and, most importantly, its direct order to the executrix to give notice to the creditors in accordance with the terms of the statute. In *Tulsa*, the Supreme Court fairly characterized as state action the joint action of the probate court and its appointed executrix, an officer of the court, to proceed with the probate of the estate by requiring creditors to give notice within a designated time period. It is well-established that such substantial joint action by private and state actors can constitute state action. *See Lugar v. Edmondson Oil*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Snidack v. North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Snidack v. Family Fin. Corp.*,

---

**15.** In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175, 92 S.Ct. 1965, 1972, 32 L.Ed.2d 627 (1971), the Court further developed the reasoning underlying *Burton*. The Court characterized *Burton* as dependent upon the "symbiotic relationship between lessor and lessee[,] . . . where the private lessee obtained the benefit of locating in a building owned by the state-created parking authority, and the parking authority was enabled to carry out its primary purpose of furnishing parking space by advantageously leasing portions of the building . . . to [the restaurant]." No such symbiotic relationship exists when a private litigant exercises a peremptory challenge.

**16.** The fundamental difference is illustrated by a comparison between these procedures. The probate court has discretion whether to admit

the will to probate; the trial judge has no discretion to refuse a peremptory challenge. The probate court takes an active role in the process by appointing the executor; the trial judge merely excuses a struck juror. The probate court's appointment of an executor has the legal significance of beginning the two month period in which claims against the estate must be filed; the trial judge commits no act with any legal significance by excusing a juror. The probate court in *Tulsa* routinely issued orders to compel the executor to give notice to creditors; the trial judge issues no order of any kind when a private litigant exercises a peremptory challenge. In short, the probate court's active control permeated the entire probate proceeding at every procedural step; the trial judge has a minimal role in the exercise of a peremptory challenge.

395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). The key distinction overlooked by the panel majority is the difference between "joint action," in which the state actor affirmatively and substantially supports the private actor, and "interaction," in which state and private actors are present on the scene but where "the admittedly discriminatory policy [may not] in any way be ascribed to a governmental decision." *Lugar*, 457 U.S. at 937–38, 102 S.Ct. at 2754 (footnote omitted). In making this distinction, it is important to keep in mind the Supreme Court's emphatic insistence that "*the conduct allegedly causing* the deprivation of a federal right be fairly attributable to the State." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. This focus on the specific activity allegedly causing the constitutional injury is evident in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). There, the Court examined whether the state's licensing and regulation of private utilities was state action sufficient to render the utilities' decision to terminate electrical service without notice or a hearing to the consumer subject to a section 1983 claim. The Court stated that "[a]pproval by a state utility commission of [a request to approve the utilities' practices] from a regulated utility, *where the commission has not put its own weight on the side of the proposed practice by ordering it*, does not transmute a practice initiated by the utility and approved by the commission into 'state action.'" *Id.* at 357, 95 S.Ct. at 456–57 (emphasis supplied). The Court concluded that the commission's approval, at most, "amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired." *Id.*

The trial judge, like the utility commission, does no more than determine that the private litigant is entitled to employ his peremptory challenges if he so desires. Private litigants make the decision whether to exercise a peremptory challenge. Although the utility was subject to heavy state regulation in *Jackson*, the Court found this an insufficient basis for finding state action. *Id.* Similarly, the trial

court's limited regulation of the peremptory challenge process, *see ante* at 1286–87 (trial judge controls voir dire, has discretion whether to excuse juror for cause, and determines order in which parties exercise their peremptory challenges), should not establish state action. *See also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1971) (refusing to find state action where state regulation did not foster or encourage discrimination); *Rendell–Baker v. Kohn*, 457 U.S. 830, 840–43, 102 S.Ct. 2764, 2770–72, 73 L.Ed.2d 418 (1982) (finding no state action where decision to discharge teacher at publicly funded and regulated school was not compelled or influenced by any state regulation).

Careful analysis therefore reveals that the acquiescence of a judge when private litigants exercise peremptory challenges is fundamentally different from the state action established in *Shelley, Burton,* or *Tulsa*. A common thread runs through each of these cases: the state in some way played an *active, affirmative role* in the specific private conduct that the plaintiff alleged to be unconstitutional. In *Shelley*, the court was asked to enforce a facially discriminatory covenant that would have required the court, supported by the full panoply of state power, to take affirmative steps to remove the Shelleys from their home. In *Burton*, the state-owned garage was financially dependent upon the profits received from a state-built restaurant that discriminated against black customers. In *Tulsa*, the probate court appointed the executor and issued an order requiring that notice be given to creditors. The trial judge plays no such role in the peremptory challenge process. As the Supreme Court said in *Moose Lodge*, 407 U.S. at 173, 92 S.Ct. at 1971.

The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. . . . Our holdings indicate that where

the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," *Reitman v. Mulkey*, 387 U.S. 369, 380 [87 S.Ct. 1627, 1634, 18 L.Ed.2d 830] (1967), in order for the discriminatory action to fall within the ambit of constitutional prohibition.

### Conclusion

The majority finds state action where it previously has never been found. Such a radical transformation of the state action doctrine, necessarily requiring the death of the peremptory challenge and subjecting every element of civil trials to constitutional analysis, is both unprecedented and unwarranted. It is unsupported by the prevailing precedent of the Supreme Court and overrules, *sub silentio*, the established precedent of this circuit.[17] Accordingly, I respectfully dissent.

---

**17.** The Seventh Circuit has refused to find state action in cases where the state was more involved in a process. In *Spencer v. Lee*, 864 F.2d 1376 (7th Cir.1989) (en banc), this court held that a private physician and private hospital do not act under color of state law when they commit a mentally disturbed person. In *Spencer*, the private physician's certification for commitment did not receive judicial review until after the patient had already been admitted to the hospital. The physician acted pursuant to a state adjudication procedure where the state had assumed express responsibility for the ultimate decision. Furthermore, the state of Illinois possessed the exclusive authority to hold a person against his will. In determining that no state action was present, this court focused on the private nature of the decision to commit a person. It noted that, despite the state involvement in authorizing or constraining the private activities, "the activities themselves remain private." *Id.* at 1381.